## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VOTE FORWARD,
     611 Pennsylvania Ave. SE #192
     Washington, DC 20003;

AARON CARREL,
     2 N Roby Rd.
     Madison, WI 53726;

VOCES UNIDAS DE LAS MONTAÑAS,
     1001 Grand Ave., Suite 107
     Glenwood Springs, CO 81601;

COLORADO ORGANIZATION FOR
LATINA OPPORTUNITY AND
REPRODUCTIVE RIGHTS,
     P.O. Box 40991
     Denver, CO 80204;

and

PADRES & JÓVENES UNIDOS,
     4130 Tejon St., Suite C
     Denver, CO 80211,

                 *Plaintiffs*,

     v.

LOUIS DEJOY, in his official
capacity as the Postmaster General,
     475 L'Enfant Plaza SW,
     Washington, D.C. 20260-0546;

and

UNITED STATES POSTAL SERVICE,
     475 L'Enfant Plaza SW
     Washington, DC 20260-0546,

                 *Defendants*.

Civil Case No. 1:20-cv-02404

COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

Plaintiffs Vote Forward, Aaron Carrel, Voces Unidas de las Montañas, Colorado Organization for Latina Opportunity and Reproductive Rights ("COLOR"), and Padres & Jóvenes Unidos, by and through their undersigned attorneys, bring this Complaint against the above-named Defendants; their respective agents, officers, employees, and successors; and all persons acting in concert with each or any of them. In support of this Complaint, Plaintiffs allege the following:

## INTRODUCTION

1.     Even in ordinary years, the reliable delivery of mail ballots by the United States Postal Service ("USPS") is critical to our democracy. And this is no ordinary year.

2.     USPS's reliability has never been taken for granted: it is safeguarded by this nation's laws. Statutory obligations and procedures protect USPS from political influence and prevent capricious shifts in policy, whether by artfully crafted press release, tweet, or shifting congressional testimony.

3.     These safeguards are all the more important at this moment, when a presidential election hangs in the balance. A public health crisis has prompted states to make the unprecedented decision to enable 83% of all Americans who are eligible to vote—approximately 190 million people—to vote by mail. USPS's capabilities are central to this most consequential election: USPS is tasked with no less than delivering democracy.

4.     Since his appointment as Postmaster General in May 2020, Defendant Louis DeJoy has implemented policies that have undermined USPS's ability to ensure the on-time delivery of mail ballots. In particular, on July 10, 2020, Postmaster DeJoy announced a ban on late and extra delivery trips (the "Late Trips Policies"). Under this

policy, a substantial volume of mail will be "left on the floor" at postal facilities, risking a cascading delay in the delivery of Election Mail.  In his testimony before the House of Representatives on August 24, 2020, DeJoy was boldly unrepentant in standing by the Late Trip Policies.

5.      Similarly, although the number of decommissioned mail sorting machines skyrocketed under his tenure, DeJoy has unapologetically refused to restore the hundreds of processing machines decommissioned since his first day as Postmaster General in June 2020.  The total number of sorting machines removed under DeJoy's tenure alone could have processed over 1.6 million ballots an hour in the months leading up to the November 2020 election, but DeJoy has testified that he will not reinstate them.

6.      The Late Trips Policies and the failure to restore decommissioned sorting machines (collectively, the "Challenged Policies") have also taken place in tandem with Postmaster General DeJoy's unequivocal failure to reverse certain additional policies that negatively impact mail delivery.  He has left the authorization of overtime during the election to the discretion of local managers.  He has offered vague assurances that further resources will be made available to facilitate the delivery of Election Mail.

7.      Throughout this process, Defendants have failed to honor the statutory requirement of 39 U.S.C. § 3661 that changes in postal policy be approved by the Postal Regulatory Commission (PRC).  These procedures exist for a reason:  to prevent the poorly articulated, ill explained, and shifting policy pronouncements that have marked DeJoy's brief tenure as Postmaster General.

8.      One voice, however, has been quite clear on the subject of mail balloting.  President Trump has repeatedly and emphatically stated his opposition to mail

balloting, baselessly asserting that it is part of a nefarious plan by his opponents to steal the election.

9.     In this historic moment, Defendants should be redoubling their efforts to facilitate the right to vote and provide a clear articulation of their policies and the basis for them.  Instead, DeJoy has ignored USPS's statutory obligations, obfuscated the implementation and cessation of numerous policies, and unreasonably burdened the right to vote.  His policies cannot stand.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over Plaintiffs' claims under Article III of the Constitution and 28 U.S.C. § 1331.  An actual and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201, 2202 and the Court's equitable powers.  Plaintiffs have no adequate remedy at law.

11.     Venue is proper in this district because Defendants reside in this judicial district and a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district.  28 U.S.C. § 1391(c)(2), (e)(1).

## PARTIES

12.     Plaintiff Vote Forward is a 501(c)(4) nonprofit organization founded in 2019 that works to empower grassroots volunteers to help register voters from traditionally underrepresented communities and encourage them to vote.  Vote Forward builds tools to enable Americans across all 50 states to encourage their fellow citizens to participate in our democracy.  To date, more than 165,000 volunteers have used the Vote Forward platform and hand-written more than 8 million "Please vote!" and "Please

register to vote!" letters to fellow citizens. Vote Forward's overall 2020 get-out-the-vote ("GOTV") goal is to send 10 million letters in late October. As a result of recent disruptions and delays in mail delivery by USPS, the organization has had to redirect significant organizational resources to the work of responding to a deluge of questions and concerns from our volunteers about the impact of those delays on their efforts. The organization has also launched two entirely new programs to understand the scope of current mail delays, and to investigate their likely impact on the efficacy of the GOTV program.

13. Plaintiff Aaron Carrel lives in Madison, Wisconsin. He is a registered voter who voted by mail in the Wisconsin primary election. He lives with a relative who is immunocompromised, and he intends to vote by mail in the general election because voting in person would put his family member at risk of contracting COVID-19.

14. Plaintiff Voces Unidas de las Montañas ("Voces Unidas") is a non-profit organization that seeks to elevate the voices of Latinos in three rural Colorado counties through civic engagement. Latinos represent 30% of the population in Garfield and Eagle counties and 10% of the population in Pitkin county. The rural communities Voces Unidas serves rely heavily on USPS for both every day communication and for the exercise of their civic rights, including the right to vote. The delays caused by USPS's policies threaten to frustrate Voces Unidas's mission to elevate the voices of Latinos. The delays caused by USPS's policies have also undermined Latinx and rural communities' trust in USPS, causing Voces Unidas to have to expend its limited resources on campaigns to regain the communities' trust in the post office and in the electoral system. Voces Unidas expects to devote resources for additional education and outreach to this effect.

15.     Plaintiff Colorado Organization for Latina Opportunity and Reproductive Rights ("COLOR") is a grassroots nonprofit organization founded in 1998 that works to enable Latino individuals and their families to lead safe, healthy and self-determined lives.  COLOR is headquartered in Denver, Colorado and works across seven different cities including Denver Metro, Leadville, Telluride, Lamar, Silverthorne, Trinidad and Glenwood Springs.  The organization has over 11,000 members.  Colorado Latinos remain the hardest hit by COVID-19, being over-represented in the essential worker population and in death rates.  COLOR canvassers have worked non-stop, phone banking from their homes to ensure the community gets out the vote.  Even in a state where elections are conducted entirely by mail, creating voting plans has been challenging when the community faces widespread job loss, illness, and housing issues.  Recent changes in USPS policies have created an additional challenge.  As a result of recent disruptions and delays in mail delivery by USPS, COLOR has needed to redirect significant organizational resources to ensure its members and communities are voting early so their ballots are received in a timely manner.  This requires additional resources for phone banking, mailers, and digital outreach.  COLOR is "all hands on deck" to ensure the community is informed of delays and is being proactive about returning ballots early to ensure votes are counted.

16.     Plaintiff Padres & Jóvenes Unidos is a nonprofit organization building a movement of working-class Latinx and immigrant youth and families leading community-based solutions to expose and dismantle the root causes of systemic discrimination, racism, economic inequity, and institutional injustice.  Founded in 1992 and headquartered in Denver, Colorado, Padres & Jóvenes Unidos has over 1,000 members across the Denver Metro Area.  To advance its core mission, the organization

has engaged the community in using their voice by participating in local and national elections. Padres & Jóvenes Unidos's civic engagement work is aimed at increasing voter turnout, educating about electoral issues, voter suppression, and disenfranchisement with an overall goal of building power for our most vulnerable communities. The effects of the USPS policies have frustrated the mission of Padres & Jóvenes Unidos and required the organization to redirect significant organizational resources to inform members about how to effectuate their right to vote amidst the disruptions and delays in mail delivery.

17. Defendant USPS is an independent establishment of the executive branch of the U.S. Government. *See* 39 U.S.C. § 101. USPS is charged with the obligation of providing postal services to the citizens of the United States, and it maintains postal service facilities throughout the United States, including in the District of Columbia. USPS headquarters are located at 475 L'Enfant Plaza, S.W., Washington, D.C. 20260-0546.

18. Defendant Louis DeJoy is the Postmaster General of the USPS. DeJoy is sued in his official capacity.

## BACKGROUND

I. **The Increased Importance of Voting by Mail Has Been Met With Animosity from the Federal Government Under the Trump Administration.**

A. **Voting by Mail Is Critical to the November 2020 Election.**

19. On March 11, 2020, the World Health Organization ("WHO") declared a global pandemic resulting from the spread of COVID-19. Two days later, President Trump announced that the outbreak of COVID-19 in the United States constituted a national emergency. By April 2020, the United States recorded the highest number of

confirmed COVID-19 cases in the world, and as of August 2020, it has reported over five million COVID-19 cases, including 177,332 deaths.[1]

20.     While people of all ages have contracted and died from COVID-19, the virus poses additional and acute threats for individuals with preexisting medical conditions—such as kidney disease, heart disease, asthma, hypertension, and diabetes—who face increased risks of serious complications from COVID-19, regardless of age.[2] The Centers for Disease Control and Prevention ("CDC") has also recognized that "[l]ong-standing systemic health and social inequities have put many people from racial and ethnic minority groups at increased risk of getting sick and dying from COVID-19."[3] The number of known COVID-19 cases in the United States is 2.6 times higher among Black persons than white persons, and 2.8 times higher among Hispanic or Latinx persons than white persons.[4]

---

[1] WHO, *WHO Coronavirus Disease (COVID-19) Dashboard* (last visited Aug. 27, 2020), https://covid19.who.int/.

[2] CDC, *Coronavirus Disease 2019 (COVID-19): People With Certain Medical Conditions* (last updated Aug. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[3] CDC, *Health Equity Considerations and Racial and Ethnic Minority Groups* (last updated July 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fracial-ethnic-minorities.html.

[4] CDC, *COVID-19 Hospitalization and Death by Race/Ethnicity* (last updated Aug. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html.

21.     There is currently no approved medication or vaccine for COVID-19, and medical experts and government agencies generally agree that a vaccine will not be available to the public in 2020.[5]

22.     In the interim, experts have identified techniques that are effective in decreasing transmission of COVID-19, including practicing social distancing by avoiding close, in-person contacts, avoiding large gatherings, wearing masks in public, and practicing frequent and thorough handwashing.

23.     As a result of the pandemic and its restrictions on in-person voting, the demand for mail-in voting—which has existed in the United States for decades—has skyrocketed.  During the COVID-19 pandemic, in-person voting presents an increased risk of infection to all voters, and an intolerable risk of infection for voters who are particularly vulnerable to the illness.  For elderly voters, voters with pre-existing medical conditions, and voters from racial and ethnic minority groups, the ability to cast a ballot by mail is essential.  And even in ordinary years, casting a mail-in ballot may be the only realistic means of voting for voters with disabilities or those who are unable to get to the polls.

24.     The CDC, for example, has warned of the significant possibility of person-to-person COVID-19 transmission at polling sites and has encouraged the use of "voting

---

[5] HHS, *Fact Sheet Explaining Operation Warp Speed*, (June 16, 2020), https://www.hhs.gov/about/news/2020/06/16/fact-sheet-explaining-operation-warp-speed.html; Gisela Crespo, US gets Reality Checks on COVID-19 Vaccine, Duration of Symptoms, CNN (July 24, 2020), https://www.cnn.com/2020/07/24/health/us-coronavirus-friday/index.html.

methods that minimize direct contact and reduce crowd size at polling locations," such as mail-in voting.[6]

26.	As of August 15, 2020, 43 states and the District of Columbia will permit all eligible voters to vote by mail during the COVID-19 pandemic.[7] And 26 states and the District of Columbia have modified their election procedures to make voting by mail more accessible during the pandemic.[8] For example, Alabama, Massachusetts, New Hampshire, Kentucky, and West Virginia have expanded the scope of existing state election laws establishing absentee ballot eligibility for illness, injury, or disability to include all eligible voters concerned about, or taking preventative measures because of, COVID-19.

27.	Because of the pandemic, California, Nevada, New Jersey, and the District of Columbia will proactively mail ballots to all registered voters in advance of the general election. And five states—Colorado, Hawaii, Oregon, Washington, and Utah—

25.	Consistent with the CDC's guidance, states have expanded mail-in voting access to ensure that eligible voters can vote both safely and securely during the 2020 primary and general election cycle.

---

[6] *See* CDC, *Coronavirus Disease 2019 (COVID-19): Recommendations for Election Polling Locations* (last updated June 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.

[7] *Id.* (42 currently listed on website, with change to Kentucky voting system not yet reflected).

[8] *Id.*

will conduct their elections *entirely* by mail.[9]  In these eight states and the District of Columbia, approximately 52 million voters will automatically receive ballots in the mail this fall.

28.     Consequently, at least 83% of eligible voters—approximately 190 million people—will have the opportunity to vote by mail-in absentee ballot in the November 2020 election.[10]

29.     During the primaries, many of these states saw a record numbers of mail-in ballots and ballot requests.  In Wisconsin, where Plaintiff Aaron Carrel resides and votes, nearly one million voters submitted ballots by mail in the April 2020 primary election.  Other states saw dramatic spikes in the proportion of ballots submitted by mail in their primary elections as compared to 2016.  In New York, more than 1.7 million people requested ballots by mail in the June 2020 primary election—a tenfold increase in absentee ballot requests relative to 2016.  And in Pennsylvania, approximately 1.9 million voters requested mail-in ballots—18 times more absentee ballots in the 2020 primary than for the 2016 primary election.

30.     Many states have recently expanded their use of mail-in ballots.  For the first time, California and the District of Columbia will automatically send a mail-in ballot to all registered active voters for the November 2020 general election.  In

---

[9] Nat'l Conf. of State Legislatures, *VOPP: Table 18: States With All-Mail Elections* (Apr. 21, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-18-states-with-all-mail-elections.aspx.

[10] Kate Rabinowitz & Brittany Renee Mayes, *At least 83% of American Voters Can Cast Ballots By Mail in the Fall*, Wash. Post (Aug. 20, 2020), https://www.washingtonpost.com/graphics/2020/politics/vote-by-mail-states/.

Pennsylvania and Delaware, all voters were given the option of voting by mail for the first time in the 2020 primary election.

31.    Based on recent election trends, experts conservatively predict "roughly 80 million mail ballots" will be submitted this fall, "more than double the number [of mail ballots] that were returned in 2016."[11]  Indeed, "[s]ome states anticipate 10 times the normal volume of election mail."[12]

### B.    The Trump Administration Has Repeatedly and Baselessly Attacked Mail-In Voting.

32.    In the lead-up to the 2020 election, President Trump has repeatedly asserted, without evidence, that voting by mail will lead to millions of fraudulent ballots being cast and will delegitimize the election outcome.[13]  His assault on voting by mail has been relentless, with over 70 distinct attacks on mail voting.[14]  And the President has openly stated that the motivation for refusing to fund USPS as part of the COVID-19 stimulus packages is to frustrate voters' ability to cast their ballots by mail.

---

[11] Juliette Love, Matt Stevens, & Lazaro Gamio, *Where Americans Can Vote by Mail in the 2020 Election*, N.Y. Times (last updated Aug. 14, 2020), https://www.nytimes.com/interactive/2020/08/11/us/politics/vote-by-mail-us-states.html.

[12] Erin Cox, et al., *Postal Service Warns 46 States Their Voters Could Be Disenfranchised by Delayed Mail-In Ballots*, Wash. Post (Aug. 14, 2020), https://www.washingtonpost.com/local/md-politics/usps-states-delayed-mail-in-ballots/2020/08/14/64bf3c3c-dcc7-11ea-8051-d5f887d73381_story.html (emphasis added).

[13] *See generally* Amy Gardner, Josh Dawsey, & Paul Kane, *Trump Opposes Election Aid for States and Postal Service Bailout, Threatening Nov. 3 Vote*, Wash. Post (Aug. 13, 2020), https://www.washingtonpost.com/politics/trump-mail-voting/2020/08/13/3eb9ac62-dd70-11ea-809e-b8be57ba616e_story.html.

[14] *Id.*

33.     During a March 30, 2020 interview on Fox & Friends regarding the Democrats' COVID-19 stimulus bill, which would provide funding for election administration and USPS to facilitate voters' ability to cast their ballots safely from home during the pandemic, President Trump stated that a Congressional stimulus bill's funding for voting by mail would promote "levels of voting that, if you ever agreed to it, you'd never have a Republican elected in this country again."[15]

34.     On August 13, 2020, in a subsequent Fox Business Network interview about the stimulus bill, President Trump further clarified his views, stating: "They want three and a half billion dollars for the mail-in votes. Universal mail-in ballots. They want $25 billion, billion, for the Post Office. Now they need that money in order to make the Post Office work so it can take all of these millions and millions of ballots. . . . But if they don't get those two items that means you can't have universal mail-in voting because you *[sic]* they're not equipped to have it."[16]

35.     In the midst of President Trump's war on voting by mail, DeJoy—"a Republican Party and Trump campaign megadonor"—was appointed Postmaster General, just months before the November presidential election.[17]

---

[15] Aaron Blake, *Trump Blurts out His True Motive on Mail-in Voting*, Wash. Post (Aug. 13, 2020), https://www.washingtonpost.com/politics/2020/08/13/trump-blurts-out-his-true-motive-blocking-post-office-funding-mail-in-voting/.

[16] Ellie Kaufman et al., *Trump says he opposes funding USPS because of mail-in voting*, CNN (Aug. 13, 2020), https://www.cnn.com/2020/08/13/politics/trump-usps-funding-comments-2020-election/index.html.

[17] Lucy Tompkins, *Who Is Postmaster General Louis Dejoy?* N.Y. Times (Aug. 24, 2020), https://www.nytimes.com/article/general-louis-dejoy-postmaster.html.

**II.     Statutory Obligations Safeguard USPS's Responsibility to Promote Efficient Delivery of Mail from Political Influence.**

**A.     USPS Mandate and Operations**

36.     USPS operates as "an independent establishment of the executive branch of the Government of the United States" that is overseen by a Board of Governors, including the Postmaster General.  39 U.S.C. §§ 201, 202(a)–(d).  USPS and its Board of Governors are responsible for "maintain[ing] an efficient system of collection, sorting, and delivery of the mail nationwide."  39 U.S.C. § 403(b)(1).

37.     By statutory mandate, USPS must be "operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people," and must "provide prompt, reliable, and efficient services to patrons[.]"  39 U.S.C. § 101(a).  And the costs of "maintaining the Postal Service shall not be apportioned to impair the overall value of such service to the people."  *Id.*

38.     On average, USPS processes and delivers 472.1 million pieces of mail every day.[18]  Most incoming mail is processed by postal workers at mail processing facilities ("processing plants").  Processing mail involves sorting the mail for transportation and delivery and, for certain types of mail, applying a postmark.  Processed mail is dispatched in trucks from the processing plants to (a) non-local destinations, where it

---

[18] *One Day in the Life of the U.S. Postal Service*, USPS Postal Facts (last visited Aug. 27, 2020), https://facts.usps.com/one-day/#:~:text=The%20Postal%20Service%20adds%204%2C221%20addresses%20to%20our%20delivery%20network%20every%20day.&text=Each%20day%20the%20Postal%20Service%20processes%20and%20delivers,pieces%20of%20First%2DClass%20Mail.&text=On%20average%2C%20the%20Postal%20Service,minute%20and%205%2C464%20each%20second.

will undergo further processing, or (b) to delivery units, such as a post office or carrier station, for delivery to local destinations.

39.     When processed mail arrives at the delivery unit from the processing plant, clerks and carriers complete any final sequencing as needed, and carriers then deliver the processed mail and collect new mail on foot or by vehicle in a prescribed area.

40.     Mail can be collected in either of two ways:  a carrier collects the mail on her route, or a clerk collects the mail at the post office.  The mail collected by carriers and clerks is dispatched by truck from the delivery unit to the processing plant, where the cycle begins again.

41.     To ensure that every piece of mail goes out of the plant or delivery unit every day, late trips (trips taken later than initially scheduled) or extra trips (trips taken in addition to regularly-scheduled trips) are frequently necessary.  This is true for deliveries from the delivery unit to the processing plant, from the processing plant to the delivery unit, and, in certain circumstances, from the delivery unit to the recipient of the mail.

**B.     Procedural Requirements for Enacting Changes to USPS Services**

42.     Congress charged USPS with the responsibility to "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees." 39 U.S.C. § 403(a); *see also* 39 U.S.C. § 3661(a) ("The Postal Service shall develop and promote adequate and efficient postal services.").

43. When "determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).

44. Before enacting any policies that have a nationwide impact on postal services, USPS has a statutory obligation to submit a proposal to the Postal Regulatory Commission. 39 U.S.C. § 3661. The Postal Regulatory Commission was created by the Postal Reorganization Act, Pub. L. No. 91-375, 84 Stat. 719, which was designed "to increase the efficiency of the Postal Service and reduce political influences on its operations." *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 740 (2004). Like USPS, the Commission serves as an "independent establishment of the executive branch." 39 U.S.C. § 501. The Commission is "composed of 5 Commissioners, appointed by the President, by and with the advice and consent of the Senate." *Id.* § 502(a). "The Commissioners shall be chosen solely on the basis of their technical qualification, professional standing, and demonstrated expertise in economics, accounting, law, or public administration, and may be removed by the President only for cause." *Id.*

45. Pursuant to the Postal Reorganization Act, "[w]hen the Postal Service determines that there should be a change in the nature of postal services [that] will generally affect service on a nationwide or substantially nationwide basis," it must "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." *Id.* § 3661(b).

46. Under the Commission's Rules of Practice and Procedure, USPS is required to submit a proposed change in the nature of postal services to the Postal

Regulatory Commission "not less than 90 days before the proposed effective date of the change in the nature of postal services involved." 39 C.F.R. § 3020.112.

47.     After USPS submits a request to the Postal Regulatory Commission, the Commission must provide "an opportunity for hearing on the record under sections 556 and 557 of [the Administrative Procedure Act] . . . to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public." The public is entitled to submit comments in proceedings before the Commission. 39 C.F.R. § 3661(c).

48.     After the hearing, the Commission must provide an advisory opinion that "shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title." *Id.* § 3661(c).

49.     Consistent with Section 3661's requirements, USPS has previously submitted proposed changes affecting the nature of postal services to the Commission within a reasonable time before the effective date of the proposal and has requested an advisory opinion from the Commission.[19]

### C.     USPS Has Traditionally Issued and Followed Policies Consistent with Its Critical Role in Facilitating the Right to Vote.

50.     Since its earliest days, our Nation's postal system has enabled Americans to participate in electoral democracy.

---

[19] *See, e.g.*, Postal Reg. Comm'n, *Advisory Op. on Mail Processing Network Rationalization Service Changes*, N2012-1 (Sept. 28, 2012), https://www.apwu.org/sites/apwu/files/resource-files/PRC%20advisory%20opinion%20on%20network%20rationaliztion%20plan.pdf.

51.     During the Civil War, nearly 150,000 Union soldiers relied on the postal system to deliver ballots in the 1864 presidential election.  In the midst of World War II, U.S. soldiers depended on the postal system to cast their votes in the 1944 presidential election.  And in elections in between and since, soldiers stationed around the world have relied on postal voting to participate in elections at home.

52.     So too have civilians.  As explained above, five states hold all-mail elections,[20] an additional 34 states and Washington, D.C. allow residents to vote by mail regardless of their reasons for doing so,[21] and every other state permits voting by mail under some circumstances, such as for those with physical illness or disabilities that prevent a trip to the polling place or those who expect to work a shift of 10 hours or more on election day.[22]  Postal voting is and has been integral to American elections for decades.

53.     "In determining all policies for postal services," USPS has a statutory obligation to provide "the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail."  39 U.S.C.

---

[20] *See* Colo. Rev. Stat. § 1-5-401; Haw. Stat. § 11-101; Or. Rev. Stat. § 254.465; Wash. Rev. Code § 29A.40.010; Utah Code Ann § 20A-3-302.

[21] *See* Alaska Stat. § 15.20.010; Ariz. Rev. Stat. § 16-541; Cal. Elec Code § 3003; D.C. Mun. Regs. Tit. 3, § 720; Fla. Stat. 101.62; Ga. Code § 21-2-380; Idaho Code § 34-1001; 10 ILS 5/19-1; Iowa Code § 53.1; Kan. Stat. Ann. § 25-1119(a); 21-A ME Rev. Stat. § 751; Md. Elec. Law § 9-304; M.C.L.A. § 168.759; Minn. Stat. § 203B.02; Mont. Code § 13-13-201; Neb. Rev. Stat. Ann. § 32-938; NRS § 293.313; N.J. Rev. Stat. § 19:63-3; N.M. Stat. § 1-6-3; N.C. Gen. Stat. § 163-226; N.D. Cent. Code § 16.1-07-01; Ohio Rev. Code § 3509.02; 26 Okla. Stat. § 26-14-105; 25 P.S. § 3150.11; R.I. Gen Laws § 17-20-2; S.D. Cod. Laws § 12-19-1; 17 VSA § 2531; Va. Code Ann. § 24.2-700; Wis. Stat. § 6.86(1)(ac); Wyo. Stat. § 22-9-102.

[22] *See, e.g.*, Ala. Sec'y of State, *Absentee Voting Information*, https://www.sos.alabama.gov/alabama-votes/voter/absentee-voting.

§ 101(e).  Consistent with that legal duty and its integral role in facilitating the vote-by-mail process, USPS has traditionally promulgated and upheld policies that treat Election Mail—including both the ballots sent from the state to the voter, and the completed ballots returned by the voter to the state—as important letter mail.

54.     For example, USPS has formally adopted several classes of mail, including First-Class Mail and Marketing Mail, which are transported with different delivery standards and with different postage rates.  First-Class Mail has a delivery standard of 2–5 days, while Nonprofit Marketing Mail has a slower delivery standard of 3–10 days.[23]  In line with its statutory obligation, in prior years USPS has "treat[ed] Election and Political Mail as First-Class Mail," regardless of whether the election authority paid for First-Class service or the less expensive Nonprofit Marketing service.[24]

55.     USPS also traditionally takes steps to "provide greater visibility to Election Mail as it is processed."[25]  This includes "encourag[ing] election officials to use" specialized tags to identify Election Mail, such as the green Tag 191 for "Domestic and International Mail Ballots" and Tag 57 for Political Campaign Mailing,[26] and asking

---

[23] USPS, *Official Election Mail: State and Local Election Mail – User's Guide* (Jan. 2020), https://about.usps.com/publications/pub632.pdf; *see also* USPS, *Postal Pro: Service Standards Maps* (last visited Aug. 27, 2020), https://postalpro.usps.com/ppro-tools/service-standards-maps.

[24] USPS Office of the Inspector General, *Audit Report, a Service Performance of Election and Political Mail During the 2018 Midterm and Special Elections* at 7 (Nov. 4, 2019), https://www.uspsoig.gov/sites/default/files/document-library-files/2019/19XG010NO000.pdf ("OIG 2019 Report") (USPS Office of the Inspector General "concluded that this was how [Election Mail] was generally handled.").

[25] OIG 2019 Report, Appendix B (letter from USPS Acting Vice President, Processing and Maintenance to OIG).

[26] *Id.*

personnel to "identify and separate Election and Political from other mail at the facility to improve processing in accordance with standard operating procedures."[27]

56. USPS has also developed an Official Election Mail logo, a unique registered trademark that may be "used on any mailpiece created by an election official that is mailed to or from a citizen of the United States for the purpose of participating in the voting process." This logo similarly "serves to identify [Official Election Mail] for Postal Service workers and distinguish it from the thousands of other mailpieces that are processed daily." USPS has historically provided detailed information to state and local election officials, including specifications about the Official Election Mail logo and information about obtaining postage discounts.[28]

57. In prior years, USPS has also issued guidance expressly directing employees to afford the highest priority to absentee ballots in the months preceding a presidential election. For example, on August 14, 2008, USPS issued a Postal Bulletin stating: "*Employees need to be aware that absentee balloting materials are handled differently than other unpaid or short-paid mailpieces. **ABSENTEE BALLOTING MATERIALS ARE NOT TO BE RETURNED FOR ADDITIONAL POSTAGE OR DETAINED!*** The postage is collected from the election office. Any delay of absentee ballots is a violation of Postal Service policy." The bulletin explained that it is "critical

---

[27] *Id.* at 6.

[28] USPS, *Postal Bulletin 22239, Field Information Kit: Election Mail—2008, Publications 631 and 632* (2008), https://about.usps.com/postal-bulletin/2008/html/pb22239/html/ElectMailkit_006.html.

that this mail is handled correctly to avoid any negative impact on election results or the Postal Service."[29]

58.     The USPS Office of the Inspector General ("OIG") conducted an audit of the 2018 Midterm and Special Elections and concluded that "timely delivery of Election and Political Mail is necessary to ensure the integrity of the U.S. election process."[30]  To ensure timely delivery of Election Mail, the USPS OIG recommended that USPS management take several key steps, including "[e]nsur[ing] sufficient mail processing staff are assigned to appropriately process peak Election and Political Mail volume."[31]

## III.    Defendants Disregarded Procedural Safeguards and Implemented Policy Changes That Impaired USPS's Ability to Timely Deliver Election Mail.

59.     Upon being appointed Postmaster General, DeJoy immediately took action that diminished USPS's effectiveness in processing mail ballots—despite an imminent election that would involve unprecedented rates of mail voting.

60.     DeJoy implemented these new policies without any regard for the procedural requirements to enact changes to USPS services.

61.     After a substantial public outcry and a series of congressional inquiries about DeJoy's changes to USPS operations in the months preceding the November 2020 election, DeJoy purported to suspend some of the "longstanding operational initiatives" that "predate[d] [his] arrival" at USPS until after the election.  But his purported

---

[29] USPS Postal Bulletin (PB 22239) (Aug. 14, 2008) (emphasis in original); *see also* USPS Postal Bulletin (PB 22342) (July 26, 2012) ("[S]hort-paid and unpaid absentee balloting materials must never be returned to the voter for additional postage.  Postage is collected from the election office upon delivery or at a later date.").

[30] OIG 2019 Report at 2.

[31] *Id.*

rescission is facially incomplete and imprecise.  DeJoy makes no attempt to assert that he will suspend any of the policies that he personally orchestrated, and expressly testified before the Senate that some of his policies that have impaired and continue to impair the delivery of mail ballots will remain in place.

A.   **Without Following Statutory Procedures, Postmaster General DeJoy Implemented Nationwide Late Trip Policies that Impair the Right to Vote.**

62.   On May 6, 2020, Louis DeJoy was appointed the new Postmaster General and CEO of USPS.[32]

63.   Prior to his appointment, DeJoy worked as Chair and CEO of New Breed Logistics (later merged with and renamed XPO Logistics), a warehousing and distribution company, and longtime contractor with USPS.[33]  He is the first postmaster general in over two decades to have never worked at USPS.

64.   On July 10, 2020, USPS released a document entitled "Mandatory Stand-Up Talk: All Employees" that unveiled DeJoy's "operational pivot" and prescribed numerous and "immediate" changes to long-standing USPS practice.[34]

---

[32] Press Release, *Board of Governors Announces Selection of Louis DeJoy to Serve as Nation's 75th Postmaster General*, USPS (May 6, 2020), https://about.usps.com/newsroom/national-releases/2020/0506-bog-announces-selection-of-louis-dejoy-to-serve-as-nations-75th-postmaster-general.htm.

[33] *Id.*

[34] Ex. 1, USPS, *Mandatory Stand-Up Talk: All Employees* (July 10, 2020), https://www.washingtonpost.com/context/internal-usps-document-tells-employees-to-leave-mail-at-distributioncenters/175dd1ae-e202-4777-877c-33442338d1cc/.

65.     The document describes these changes as "immediate, lasting, and impactful," and it explained that "every single employee will receive this information, no matter what job they perform."[35]

66.     Specifically, the document listed the following nationwide policy changes: (i) all "Network, Plant, and Delivery" trips must "depart on time"; (ii) late trips are "no longer authorized or accepted"; (iii) extra trips are "no longer authorized or accepted"; (iv) carriers "must begin on time, leave for the street on time, and return on time;" and (v) "no additional transportation will be authorized to dispatch mail to the plant after the intended dispatch" (collectively, the "Late Trip Policies").[36]

67.     These Late Trip Policies run contrary to prior USPS policies, which instructed postal workers *not* to leave letters behind and to make multiple trips as needed to ensure that mail is timely delivered.[37]

68.     Notably, the document detailing these Late Trip Policies states: "[o]ne aspect of these changes that may be difficult for employees is that—temporarily—we may see mail left behind or on the workroom floor or docks."[38]

69.     On July 14, 2020, a USPS PowerPoint presentation entitled "PMGs expectations and plan" reaffirmed the Late Trip Policies. It states that "plants are not to send mail late," and if the "plants are not on time they will hold the mail for the next

---

[35] *Id.*

[36] *Id.*

[37] Jacob Bogage, *Postal Service Memos Detail "Difficult" Changes, Including Slower Mail Delivery*, Wash. Post (July 14, 2020), https://www.washingtonpost.com/ business/2020/07/14/postal-service-trump-dejoy-delay-mail/.

[38] Ex. 1, USPS, *Mandatory Stand-Up Talk: All Employees* (July 10, 2020).

day."[39]  The presentation also details the policy of curtailing late trips by mail carriers, stating that carriers will not start "any later" than "0900" (9:00 am), and that if the delivery units "get mail late and your carriers are gone and you cannot get the mail out without [overtime] it will remain for the next day."[40]

70.     In a letter to members of Congress dated August 6, 2020, USPS Chief Operating Officer David Williams confirmed that, at DeJoy's direction, USPS had taken "immediate steps" geared toward "improving our transportation efficiency" by, among other things, "working to eliminate extra and late trips" and reducing "unnecessary" and "unauthorized" overtime."[41]  DeJoy likewise confirmed these changes in his opening remarks before the USPS Board of Governors on August 7, 2020.[42]

71.     In an internal USPS memorandum dated August 13, 2020, DeJoy again confirmed the changes to longstanding USPS policy.[43]  Specifically, he highlighted that

---

[39] *Leaked USPS PowerPoint indicates PMG DeJoy Focus on Getting Operating Costs Under Control*, Alliance of Nonprofit Mailers (July 14, 2020), https://www.nonprofitmailers.org/leaked-usps-powerpoint-indicates-pmg-dejoy-focus-on-getting-operating-costs-under-control/ ("July 14 USPS PMG Presentation").

[40] *Id.*

[41] *See* Letter from David Williams to Senator Gary Peters et al. (Aug. 6, 2020), https://www.hsgac.senate.gov/imo/media/doc/20200806_USPS%20Response%20to%20Peters%20et%20al%20Jul%2030%20Ltr.pdf.

[42] *See* USPS, *Postmaster General Louis DeJoy's Opening Remarks for the USPS Board of Governors Aug. 7 Meeting* (Aug. 7, 2020), https://about.usps.com/newsroom/national-releases/2020/0807-pmg-bog-meeting-comments.htm.

[43] *See* USPS, *Path Forward: PMG Addresses Restructuring* (Aug. 13, 2020), https://link.usps.com/2020/08/13/path-forward-2/.

USPS "began those efforts right away," and as a result, extra trips had already been reduced by 71%.[44]

72.     In enacting these dramatic policy changes on a nationwide basis, DeJoy and USPS completely ignored the statutory requirement to submit a proposal to the Postal Regulatory Commission. Defendants wholly disregarded the statutory approval process and failed to obtain an advisory opinion from the Postal Regulatory Commission prior to instituting these policy changes.

73.     Furthermore, although the operational pivot is purportedly designed to target "soaring costs" and improve operational efficiency, it fails to explain how the new policies effectuate those goals.[45]

74.     In practice, the Late Trip Policies can cause a chain of compounding delays at every step of the ballot delivery process. This can affect both the mailing of ballots from the state elections office to the voter and from the voter back to the elections office.

75.     *Delays inflicted on the mailing of blank ballots from the elections office to the voter.* There are three potential points where the Late Trip Policies can cause at least one day of delay in the delivery of ballots from the elections office to the voter.

76.     First, once the blank ballot is delivered to the local post office, a mail handler has to deliver that ballot to a processing plant. But if the ballot arrives at the local post office after the mail handler left for the processing plant, the Late Trip Policies will not allow the mail handler to make an extra trip to deliver the blank ballot. The

---

[44] *Id.*

[45] Ex. 1, USPS, *Mandatory Stand-Up Talk: All Employees* (July 10, 2020).

mail handler must instead wait to deliver the blank ballot to the processing plant until the next day—creating the risk of a one-day delay.

77.     Second, after the processing plant receives and sorts the mail shipment that contains the blank ballot, the ballot must be placed on the mail handler's truck for delivery from the processing plant back to the voter's local post office.  But if the blank ballot is not processed in time for the mail handler's scheduled delivery from the processing plant to the post office, the Late Trip Policies require the ballot to remain at the processing plant until the next day—creating the risk of a second one-day delay.

78.     Third, once the blank ballot makes it back to the voter's local post office, a carrier has to deliver it to the voter.  However, the Late Trip Policies forbid the carrier from beginning her delivery route late.  Thus, if the blank ballot arrives at the voter's local post office after the carrier's trip has begun, the Late Trip Policies require the carrier to wait to deliver the blank ballot until the next day—creating the risk of a third one-day delay.

79.     These delays are compounded for ballots being shipped to non-local destinations, which must go through more than one processing center in order for the ballot to travel from an election office to a voter.  *See supra*, section II.A.

80.     *Delays inflicted on the delivery of completed ballots from the voter to the elections office.*  This process then repeats itself (in reverse) once the voter completes the ballot and attempts to mail it back to the election office—creating another three opportunities for delay.  Each point of delay is caused by the Late Trip Policies, which (for the reasons set forth above) bar the additional trips needed to complete the delivery of mail from one point in the chain to the next.  In particular:  First, there is the risk of a one-day delay in the transmission of the ballot from the local delivery unit to the

processing plant.  Second, there is the risk of a one-day delay once the mail is processed at the plant before it is delivered back to the local delivery unit.  Third, there is a further risk of a one-day delay when the mail is then transported from the local delivery unit to the elections office.

81.     As DeJoy acknowledged in his testimony to the House Oversight Committee on August 24, 2020, these delays are not simply theoretical.  DeJoy testified that these policies were directly responsible for delays in delivery, and "expose[d] a need to realign some of [USPS's] processing and scheduling that caused mail to miss the scheduled transportation . . . ."[46]  And data from an August 12, 2020 USPS document titled "Service Performance Measurement: PMG Briefing" showed more than an 8% decrease in on-time first-class mail delivery, and similar declines for marketing mail and periodicals.[47]

82.     The Late Trip Policies have been implemented under the adverse conditions of the COVID-19 pandemic, which magnifies the impact of that policy.  In particular, COVID-19 has caused staffing shortages at USPS, especially among letter carriers.  Approximately 40,000 postal workers have had to quarantine, over 6,000 have tested positive for COVID-19, and 83 have died from contracting COVID-19.[48]

---

[46] *See* USPS, *Statement of Postmaster General and Chief Executive Officer Louis DeJoy before the House Committee on Oversight and Reform* (Aug. 24, 2020), https://about.usps.com/newsroom/testimony-speeches/082420-pmg-statement.htm.

[47] *Service Performance Measurement: PMG Briefing*, USPS (Aug. 12, 2020), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/PMG%20Briefing_Service%20Performance%20Management_08_12_2020.pdf.

[48] *Postmaster General Louis DeJoy Testimony Transcript August 24: House Oversight Hearing* at 4:57:39–4:57:55, Rev (Aug. 24, 2020), https://www.rev.com/blog/transcripts/postmaster-general-louis-dejoy-testimony-transcript-august-24-house-oversight-hearing.

When letter carriers are sick, quarantining, dealing with the absence of child care, or otherwise unable to complete their routes, the need for other carriers to make extra and off-shift trips to ensure that the mail is delivered is at its greatest.

83.     The imminent general election, which is projected to have the highest number of mail-in ballots of all time, has further increased the need for late, extra, and off-shift trips. The combination of the sheer expansion of mail-in ballots for the general election and the critical importance of timely delivery of Election Mail has heightened the importance of ensuring that postal workers have the flexibility and extended hours necessary to complete deliveries on schedule.

### B.     The Specific Delays Inflicted by the Late Trip Policies

84.      The impact of DeJoy's policies on the right to vote varies to some degree with each state's election deadlines. The attached chart provided in Exhibit 2 to this Complaint sets forth the specific impact for states that are most critically affected by these policies. As set forth in the chart, the impact has been admitted by USPS in its July 29, 2020 letters. In light of these facts, it is clear that the Challenged Policies materially burden individuals' right to vote in at least the following three scenarios.

85.     First, 16 states have deadlines by which an individual may apply for an absentee ballot that are *very* close to Election Day. At the same time, these 16 states have strict receipt-by-Election-Day deadlines for completed ballots. Defendants' policies create delays on both the election board's mailing of a blank ballot and the voter's return of the completed ballot, making it nearly impossible for the voter to meet their state's receipt-by-Election-Day deadline. If an individual in any of these 16 states submits their application for an absentee ballot on the last day allowed by the state, and the state immediately mails this person their absentee ballot, Defendants' policies, and

the delays associated with them, will likely cause the voter to receive their absentee ballot on Election Day or shortly before then. And even assuming that the voter receives their blank ballot *before* Election Day, the additional delays caused by Defendants' policies also makes it highly likely that the completed ballot will not be received by the election official on or before Election Day.

86. Second, 29 states have receipt-by-Election-Day deadlines for completed ballots. In these states, Plaintiffs will be unable to vote by mail during the weekend before the election, because Defendants' policies will likely delay the return of Plaintiffs' ballots such that they arrive past the states' receipt-by-Election-Day deadline.

87. Third, some states will count a completed ballot if it is postmarked on or before Election Day *and* received within three days or fewer after Election Day. In these states, Defendants' policies will also likely delay the delivery of these ballots such that they are not received within three days or fewer after Election Day, even if the voter timely returns their ballot and USPS timely postmarks it.

> **1. Defendants' Policies Will Impact Voters Who Apply for Absentee Ballots by Their State's Deadline for Receipt of Absentee Ballot Applications.**

88. Currently, 29 states have receipt-by-Election-Day deadlines, which require *completed* ballots to be received by election officials on or before Election Day. Even if a returned ballot is postmarked (*i.e.*, marked as received by USPS) on or before Election Day, it will not be counted unless it is *received by election officials* on Election Day.

89. Of these 29 states with a receipt-by-Election-Day deadline, 16 of them have deadlines by which election officials may receive an application for an absentee

ballot within seven days of Election Day.[49]  These 16 states include Arkansas, Oklahoma, Pennsylvania, and Tennessee (Application Deadline of October 27); Alabama, Maine, and Wisconsin (Application Deadline of October 29); Georgia, Louisiana, Michigan, and South Carolina (Application Deadline of October 30); and Connecticut, Delaware, New Hampshire, South Dakota, and Wyoming (Application Deadline of November 2).[50]

90.    Defendants' Late Trip Policies (compounded by the pandemic, the volume of Election Mail, and Defendants' additional policies) threaten to disenfranchise voters who comply with a state's Application Deadline, and who, but for Defendants' delay, would have their votes counted.

91.    An example is illustrative here.  In Pennsylvania, an individual may apply for an absentee ballot up until October 27—one week before the election.  Assume that the election official receives the voter's application on October 27 and mails out a blank ballot to the voter that same day, and that the Defendants provide First-Class treatment (striving for a two- to five-day delivery timeline) to the blank ballot.  If one assumes the fastest possible delivery—two days—that would mean that the blank ballot would be received on October 29.  But if one adds the *three days of delay due to Defendants' policies* (and accounts for the fact that the mail is not delivered on Sunday), the voter would not receive the ballot until *Monday, November 2*.  If the voter then immediately filled in the ballot and put it in the mail, she would not be able to have any confidence that it would be received by the end of the day on Tuesday, November 3—especially in light of the potential three-day delay on the delivery of her ballot to the election officials.

---

[49] We refer to this deadline as  the "Application Deadline."

[50] *See* Ex. 2, Chart of States Where Voters' Mail-in Ballots Are Impacted By Defendants' Delays.

92. Even if the voter applied *before* her state's Application Deadline, Defendants' policies create the same result. For example, a more cautious voter may apply for her absentee ballot on October 24, three days before her state's Application Deadline of October 27. But even under the same assumptions set forth above (two-day First-Class Mail with no Sunday delivery), the additional three-day delay caused by Defendants' policies means that the voter would not receive her blank ballot until Friday, October 30. And even if she voted and mailed out her completed ballot that day, the three-day delay attributable to Defendants' policies means that her completed ballot would not be received until November 5, three days *after* the election, thus rendering her vote invalid.[51]

93. This scenario is also likely to play out in the other receipt-by-Election-Day states, several of which—including Wisconsin, where Plaintiff Aaron Carrel resides and votes—permit voters to request ballots even *later* than Pennsylvania.

94. As set forth in Exhibit 2, in the nearly 50 letters that USPS General Counsel Thomas Marshall mailed to state election officials, Defendants admit that their policies will cause delays that may disenfranchise voters who apply for absentee ballots as described. Specifically, USPS advised election officials that "if a voter submits a request [for an absentee ballot] at or near [October 27], and the ballot is transmitted to the voter by mail, there is a *significant risk* that the voter will not have sufficient time to complete and mail the completed ballot back to election officials in time for it to arrive

---

[51] Note that these two scenarios assume that all Election Mail is treated as First Class mail, as DeJoy has maintained in his recent testimony before Congress, but this assumption is undercut by the July 29 letters themselves, which communicated to election officials that ballots sent by Marketing Mail will be ordinarily delivered on a 3–10 day timeline, and that no specific transit times can be guaranteed.

by the state's return deadline."[52]  Yet despite recognizing the "significant risk" of

disenfranchisement, Defendants continue to implement policies that delay the delivery

of First-Class Mail, including Election Mail, and—in the same breath—admit that USPS

"cannot adjust its delivery standards to accommodate the requirements of state election

law."[53]

95.     This position is all the more alarming given that Defendants' policy

changes were instituted in violation of their statutory obligation to submit proposals to

the Postal Regulatory Commission before implementation.  *See supra*, sections II.B &

III.A.

> **2.      Defendants' Policies Will Impact Voters in States with Receipt-by-Election-Day Deadlines.**

96.     Independent of the impact on Application Deadlines, Defendants' policies

impact voters in the 29 states with receipt-by-Election-Day deadlines, by compressing

the timeline in which a voter must mail her completed ballot to ensure that her vote is

counted.

97.     A simple example highlights the risks associated with this delay.  Assume

again that a voter in Colorado—where Plaintiffs Voces Unidas, COLOR, and Padres &

Jóvenes Unidos strive to engage Latinx voters, and where thousands of members of

COLOR and Padres & Jóvenes Unidos reside and vote—submits her completed ballot by

First-Class Mail, which in the ordinary course could be delivered in two days.  The

additional three-day delay engendered by Defendants' policies, however, would preclude

voters from voting by mail on the Saturday before the election.  Put another way, any

---

[52] *See, e.g.*, Ex. 3, USPS Letter to Pennsylvania at 2 (emphasis added).

[53] *Id.*

completed ballots mailed on October 31, or later, would not be received by the local election office by Election Day—*thus rendering any such completed ballot invalid*.

98.     This scenario is likely to play out in all 16 receipt-by-Election-Day deadline states—including Wisconsin, where Plaintiff Aaron Carrel resides and votes.

99.     Defendants' admissions are consistent with this timeline.  In letters that USPS sent to state election officials on July 29, 2020, Defendants have stated that completed ballots must be mailed by voters on October 27 if they are to be received by Election Day.  The need for a full week reflects the additional risk of a three-day delay (on top of the normal First Class standard of service) created by Defendants' policies.[54]

100.     This harm is particularly acute for voters in Colorado, Hawaii, and Oregon, who not only face a "receipt by Election Day" deadline but also have no alternative to effectuate their right to vote without the threat of being disenfranchised by delay, because their states conduct elections *entirely by mail*.  Furthermore, voters in Alabama and Indiana are likely to suffer severe impacts attributable to Defendants' policies because their ballots must be received *by noon* on Election Day,[55] and in Louisiana, on the day *before* the election.[56]

101.     In light of the ongoing pandemic, swarms of voters have opted to forgo voting in person in favor of voting by mail.  Consequently, Defendants' Late Trip Policies—which were implemented in the midst of this pandemic, following numerous

---

[54] *See, e.g.*, Ex. 3, USPS Letter from T. Marshall to Sec'y Boockvar (July 29, 2020).

[55] Ala. Code § 17-11-18; Ind. Code Ann. § 3-11.5-4-7.

[56] La. Rev. Stat. 18:1308 (mailed ballots must be received by day before election at 4:30 p.m.).

reports of ballots being rejected for untimeliness through no fault of the voter—threaten to disenfranchise voters *en masse.*

### 3. Defendants' Policies Will Impact Voters With Postmark Deadlines of Three Days or Fewer.

102. Defendants' policies—and resulting injury to Plaintiffs—also apply in states with a "postmark deadline" of three days or fewer. In these states, a completed ballot will be counted by election officials if it is postmarked on or before Election Day *and* received within three days, or fewer (depending on the state), after Election Day.[57] These states include Texas (counts ballots received one day after Election Day); New Jersey (counts ballots received two days after Election Day); and Kansas, Kentucky, Massachusetts, North Carolina, and Virginia (counts ballots received up to three days after Election Day).

103. Because Defendants' policies may generate at least a three-day delay, there is a significant risk that a completed ballot that is postmarked by Election Day will not be received by the states' postmark deadline (*i.e.,* received within one to three days after Election Day).

104. For example, if Defendants accepted custody of a completed ballot in New Jersey and postmarked it on Election Day, for that ballot to be counted, New Jersey election officials must receive it *within two days* after Election Day. Under the fastest First-Class Mail delivery estimate (two days), there was a chance that the postmarked ballot would be received in time. But under Defendant's policies—which may create at

---

[57] *See* Ex. 2, Chart of States Where Voters' Mail-in Ballots Are Impacted By Defendants' Delays.

least a three-day delay—there is little to no chance that the ballot in fact will meet the postmark deadline.

105.    Put simply, voters who follow the rules are "set up for failure," based on policies implemented by Defendants that are beyond Plaintiffs' control.[58]

## IV.    DeJoy's Refusal to Restore Sorting Machines Has Burdened the Right to Vote.

106.    The decommissioning and destruction of sorting machines has accelerated under DeJoy's tenure.[59]  While USPS has similarly decommissioned such machines before, the current rate of decommissioning far exceeds that of years past.  For example, USPS decommissioned roughly 3% of sorting machines in 2018, and 5% of sorting machines in 2019.[60]  In 2020, the number of machines USPS has removed or decommissioned amounts to a 260% increase in the rate of machines decommissioned the year before.[61]

107.    Specifically, Postmaster General DeJoy moved to decommission one of every ten USPS mail sorting machines in USPS's inventory,[62] including one of every

---

[58] Pam Fessler & Elena Moore, *Signed, Sealed, Undelivered: Thousands Of Mail-In Ballots Rejected for Tardiness*, NPR (July 13, 2020), https://www.npr.org/2020/07/13/889751095/signed-sealed-undelivered-thousands-of-mail-in-ballots-rejected-for-tardiness.

[59] Jacob Bogage & Christopher Ingraham, *Here's Why the Postal Service Wanted to Remove Hundreds of Mail-Sorting Machines*, Wash. Post (Aug. 20, 2020), https://www.washingtonpost.com/business/2020/08/20/postal-service-mail-sorters-removals/.

[60] *Id.*

[61] *Id.*

[62] Cox, *supra* note 12.

seven Delivery Barcode Sorter (DBCS) machines.[63]  DBCS machines make up the bulk of

USPS's mail sorting operation and are used to sort envelope mail, such as letters,

postcards, and—critically—ballots.[64]  DBCS machines are capable of sorting through

35,000 pieces of mail per hour.[65]

108.    USPS planning documents reflect that, in June and July, USPS planned to

remove 746 letter sorting machines, including both DBCS and other machines.[66]  Since

then, it has been reported that subsequent additional USPS internal documents

reflected that "USPS planned to remove 502 DBCS (Delivery Barcode Sorter) machines,

or 13.2% of its total inventory by September 30," and that "nearly 95%, or 475, of those

were scheduled to be removed by the end of July."[67]  The nationwide loss of 475 DBCS

machines is equivalent to losing the ability to process *16,625,000 ballots an hour*.

109.    As sorting machines have been decommissioned or removed, postal

workers have reported massive backlogs of mail to be processed.  In Wisconsin, where

Plaintiff Aaron Carrel resides and votes, USPS has closed several local distribution

---

[63] Paul P. Murphy & Curt Devine, *Internal USPS Documents Raise Questions About Effectiveness of Sorting Machines Removal Order*, CNN (last updated Aug. 16, 2020), https://www.cnn.com/2020/08/16/politics/usps-documents-sorting-machine-removal-order/index.html.

[64] Aaron Gordon, *The Post Office Is Deactivating Mail Sorting Machines Ahead of the Election*, Vice (Aug. 13, 2020), https://www.vice.com/en_us/article/n7wk9z/the-post-office-is-deactivating-mail-sorting-machines-ahead-of-the-election.

[65] *Id.*

[66] *USPS Equipment Reduction Plan*, 21st Century Postal Worker (July 9, 2020), https://www.21cpw.com/usps-equipment-reduction-plan/.

[67] Murphy & Devine, *supra* note 63; Paul P. Murphy, *These are the Sorting Machines USPS Removed that Would Handle Mail and Election Ballots*, CNN (Aug. 21, 2020), https://www.cnn.com/2020/08/21/politics/usps-mail-sorting-machines-photos-trnd/index.html.

centers in recent years, forcing postal workers to route ballots mailed by election officials out of town to one of the few remaining distribution centers. Despite the added stress that the closure of distribution centers places on the remaining facilities to process mail for large populations around the state, the USPS planning documents reflected that 12 DBCS machines would be decommissioned in Wisconsin by the end of July.[68] This includes the decommissioning of two sorting machines in Madison,[69] where Plaintiff Aaron Carrel resides and votes, which threatens to delay the sorting (and, thereby, the delivery) of ballots to Carrel and other voters.

110.    The Washington Post published a map detailing which areas have seen reduced sorting capacity using data obtained from USPS:



[70]

---

[68] *USPS Equipment Reduction Plan*, 21st Century Postal Worker (July 9, 2020), https://www.21cpw.com/usps-equipment-reduction-plan/.

[69] *Id.*

[70] *See* Bogage, *supra* note 59.

111. DeJoy has made clear that he has no intention of replacing or reconnecting the sorting machines that were decommissioned or dismantled at an accelerated pace under his tenure. Following a conversation with DeJoy, House Speaker Nancy Pelosi released a statement saying DeJoy "frankly admitted that he had no intention of replacing the sorting machines."[71] And when Senator Gary Peters asked DeJoy if he intended to replace the sorting machines that had already been removed, DeJoy testified: "There is no intention to do that. They're not needed, sir."[72]

112. DeJoy's failure to restore the decommissioned sorting machines will impact USPS's timeliness in delivering Election Mail. For example, USPS representatives have also reported that sorting machines have been removed in Colorado.[73] These removals will lead to delays in postmarking and delivery of ballots due to the increased load on the few remaining sorting machines. This will significantly burden the right to vote in light of Colorado's all-mail elections.

113. Because this additional sorting capacity was eliminated in the months leading up to an election with record-breaking numbers of individuals who need to vote by mail, DeJoy's refusal to restore the decommissioned sorting machines will surely

---

[71] Press Release, Nancy Pelosi, Speaker, House of Representatives, *Pelosi Statement After Conversation with Postmaster General* (Aug. 19, 2020), https://www.speaker.gov/newsroom/81920.

[72] *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript* at 34:16, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[73] Sonia Gutierrez, *Denver-Area Post Office Employees Call for Changes*, 9News (last updated Aug. 27, 2020), https://www.9news.com/article/news/local/local-politics/usps-employees-call-for-changes-denver-area/73-27255e2f-f713-4449-8f68-755f19f92c0b.

delay the processing of ballots for people who vote in the weeks leading up to the election, and will consequently disenfranchise voters across the country.

## V. DeJoy's Purported Backtracking Under Immense Public Pressure in Advance of the 2020 Election Did Not Eliminate the Challenged Policies' Burden on the Right to Vote.

114.    The Challenged Policies took place in the context of a broader set of circumstances and actions by USPS that impaired the ability to vote by mail—all of which were met with intense public pressure.

115.    For example, in this same time period, USPS issued inconsistent statements regarding the availability of overtime.  The July 14, 2020 USPS PowerPoint presentation entitled "PMGs expectations and plans" stated that both overtime and paid overtime "will be eliminated."[74]  Since that letter, it has been reported that overtime has been "drastically reduced."[75]

116.    According to data from the American Postal Workers Union, almost 20% of all work done by USPS mail handlers, delivery drivers, and city carriers was done in

---

[74] July 14 USPS PMG Presentation, *supra* note 39.  DeJoy testified before the Senate Homeland Security and Governmental Affairs Committee on August 21, 2020, and stated that USPS has "never eliminated overtime."  *See Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript* at 33:13, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[75] *See* Cox, *supra* note 12.

overtime.[76]  USPS employees utilize overtime "to handle surges in mail—including mail-in ballots."[77]

117.    Postal workers in California reported that, upon DeJoy's decision to restrict overtime, "the [processing] facility was in chaos . . . [w]ithin days."[78]  One visitor stated the facility's "parking lot was crammed with semi-trailers piled high with unsorted mail; the warehouse-like facility was packed 'wall to wall' with mail."[79]

118.    This all occurred at the same time as USPS statements calling into question the First-Class status traditionally afforded to Election Mail,[80] the now-paused removal of mail collection boxes,[81] and the implementation of the Expedited to

---

[76] Nicole Goodkind, *Trump-Backed Postmaster General Plans to Slow Mail Delivery, Fortune*, Fortune (July 24, 2020), https://fortune.com/2020/07/24/usps-mail-delivery-postmaster-general-louis-dejoy-us-postal-service/.

[77] Letter from House Speaker Nancy Pelosi and Senate Minority Leader Charles Schumer to Postmaster Gen. Louis DeJoy, at 5 (Aug. 14, 2020), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-08-14.Pelosi%20et%20al.%20to%20DeJoy-PMG%20re%20Election%20Prep.pdf.

[78] Laura J. Nelson & Maya Lau, *"Like Armageddon": Rotting Food, Dead Animals and Chaos at Postal Facilities Amid Cutbacks*, L.A. Times (Aug. 20, 2020), https://www.latimes.com/california/story/2020-08-20/usps-cutbacks-post-office-chaos.

[79] *Id.*

[80] *See, e.g.*, Luke Broadwater & Hailey Fuchs, *A New Clash Over Mail Voting: The Cost of the Postage*, N.Y. Times (last updated Aug. 18, 2020), https://www.nytimes.com/2020/08/11/us/politics/post-office-mail-in-voting.html; Jacob Bogage, *Trump Says Postal Service Needs Money for Mail-In Voting, But He'll Keep Blocking Funding*, Wash. Post (Aug. 12, 2020), https://www.washingtonpost.com/business/2020/08/12/postal-service-ballots-dejoy/.

[81] *See, e.g.*, Jacob Bogage, *Postal Service Will Stop Removing Mailboxes*, Wash. Post (Aug. 14, 2020), https://www.washingtonpost.com/business/2020/08/14/people-are-freaking-out-about-mailbox-removals-postal-service-says-its-routine/.

Street/Afternoon Sortation ("ESAS") pilot program that further restricted mail sorting and delivery practices.[82]

119. The convergence of these practices—in the middle of a pandemic and in the months preceding the presidential election—was followed by widespread public outcry from thousands of protesters nationwide, including those who participated in the more than 800 demonstrations at post offices that took place on August 22, 2020.[83]

120. On August 18, 2020, DeJoy released a public statement purporting to suspend certain of these changes that had been implemented pursuant to "longstanding operational initiatives" that "predate my arrival at the Postal Service."[84]

121. Critically, DeJoy's statement did not purport to suspend the *new* changes implemented at his direction—including the Late Trip Policies announced in the July 10

---

[82] *See, e.g.*, David Ewing Duncan, *"It Looks Like They're Targeting Blue Urban Areas": New Postal Service Plan Is Setting Off Election Alarms*, Vanity Fair (Aug. 21, 2020), https://www.vanityfair.com/news/2020/08/new-postal-service-plan-is-setting-off-election-alarms; *USPS Announces New ESAS Delivery Initiative Test*, Nat'l Assoc. Letter Carriers (July 21, 2020), https://www.nalc.org/news/nalc-updates/usps-announces-new-esas-delivery-initiative-test.

[83] Emily Davies, *'Save the Post Office Saturday' draws thousands of protesters nationwide*, Wash. Post (Aug. 22, 2020), https://www.washingtonpost.com/local/save-the-post-office-saturday-draws-thousands-of-protesters-nationwide/2020/08/22/ee09d094-e4b8-11ea-8dd2-d07812bf00f7_story.html.

[84] Press Release, Postmaster General Louis DeJoy Statement, USPS (Aug. 18,2020), https://about.usps.com/newsroom/national-releases/2020/0818-postmaster-general-louis-dejoy-statement.pdf; *see also Statement of Postmaster General and Chief Executive Officer Louis DeJoy before the House Committee on Oversight and Reform,* USPS (Aug. 24, 2020) (purporting to pause removal of sorting machines and collection boxes, and to walk back ESAS program and questioning of first-class mail status), https://about.usps.com/newsroom/testimony-speeches/082420-pmg-statement.htm.

operational pivot directing reductions in service. And in his testimony before the House and Senate, DeJoy reaffirmed that he did not intend to suspend the Late Trip Policies.[85]

122.    DeJoy's August 18 statement did not address the specific points articulated in the "PMGs expectations and plan" PowerPoint related to the Late Trip Policy other than to say that "overtime has, and will continue to be, approved as needed."[86] The statement does not purport to rescind the policy that, if postal workers "get mail late and [their] carriers are gone and [they] cannot get the mail out without [overtime] it will remain for the next day.[87] Nor does it rescind the policy of curtailing late trips by mail carriers and stating that "plants are not to send mail late."[88]

123.    Unlike the PowerPoint, which referenced both paid overtime and overtime, DeJoy's statement does not specify whether he is lifting the suspension of overtime *pay* or overtime *hours*. And, because the Late Trip Policies banning late and extra network, plant, and delivery trips remain in place, the supposed availability of

---

[85] *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript* at 32:28–33:00, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript ("Senator Peters: . . . Are you suspending your policy eliminating extra trips? Yes or no? Louis DeJoy: No. First of all, the policy was not to eliminate extra trips. It was to mitigate extra trips. Senator Peters: Okay. So no to that."); CQ Congressional Transcripts, *House Oversight and Reform Committee Holds Hearing on Postal Service Operational Changes* (Aug. 24, 2020), https://plus.cq.com/alertmatch/454152495?0&deliveryId=64929757& uid=congressionaltranscripts-5991590&utm_medium=alertemail&utm_source=alert& openinplus=true ("The change I made was asked the team to run the trucks, transportation on time and mitigate extra trips . . . I would not know how to reverse that now. Am I to say don't run the trucks on time? Is that the answer that we're looking to get me to say here today?").

[86] July 14 USPS PMG Presentation, *supra* note 39.

[87] *Id.*

[88] *Id.*

overtime may be an illusion—if late trips and post-shift work are forbidden, then there is no work involving the transportation of mail for which overtime could be authorized.

124.    And although DeJoy has now *paused* certain of the programs that started before his tenure, DeJoy has since made clear that he has no intention of replacing or reconnecting the decommissioned machines, even though their removal was accelerated during his time as Postmaster General.[89]  This distinction is critical, because the various internal USPS planning documents indicated that, by the time DeJoy issued his statement on August 18, USPS was set to have alreday decommissioned *more than 95%* of the sorting machines that were scheduled to be removed.[90]

## VI.    Defendants' Policies Will Delay the Delivery of Election Mail.

### A.    The Delay Inflicted on All Voters

125.    A delay in delivery can mean that a "voter's right to vote . . . may hinge on random chance," with two ballots mailed at the same time, at different post offices, whether either vote is counted depends "entirely on the speed at which their local post office delivered their votes."  *Gallagher v. New York State Bd. of Elections*, No. 20 CIV. 5504 (AT), 2020 WL 4496849, at *20 (S.D.N.Y. Aug. 3, 2020).  The government cannot overlook or dismiss a "systemic problem that arbitrarily renders [thousands of] ballots invalid."  *Id.* at *17.

---

[89] *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript* at 34:16, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[90] Murphy & Devine, *supra* note 63 (95% of target decommissioned by August 16, 2020); https://www.21cpw.com/usps-equipment-reduction-plan/ (100% of target decommissioned by July 28).

126.    The Challenged Policies individually and collectively inject an intolerable risk of delay into the 2020 election.

127.    USPS data shows that "there has been a significant drop in service standards across the board since the beginning of July—including in First-Class, Marketing, Periodicals, and Priority Mail":[91]



128.    As the above chart highlights, since DeJoy took over as Postmaster General, USPS service scores are 8.10% lower than baseline. And the majority of that

---

[91] House Committee on Oversight and Reform, *New Postal Service Documents Show Nationwide Delays Far Worse Than Postal Service Has Acknowledged* (Aug. 22, 2020), https://oversight.house.gov/news/press-releases/new-postal-service-documents-show-nationwide-delays-far-worse-than-postal.

[92] House Committee on Oversight and Reform, *USPS Service Performance Measurement, PMG Briefing* (Aug. 12, 2020), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/PMG%20Briefing_Service%20Performance%20Management_08_12_2020.pdf

drop resulted from a delay in processing—the service performance from USPS possession to last processing scan is 7.96% lower than baseline.[93]

129.    The following chart, based on USPS data from the Eastern seaboard, shows a similar dramatic drop-off in timely deliveries in the immediate aftermath of the July 10 Late Trip Policies:



130.    The cause of this deterioration in service has been identified by the Postmaster General himself in his Congressional testimony.  In DeJoy's words, he only made "one change" in this time period that accounted for the drop-off in early July:  he

[93] *Id.*

[94] USPS, *Eastern Area AIM Meeting - Service Update* (Aug. 4, 2020), https://postalpro.usps.com/node/8407 (including Figures 1 and 2). For Figures 1 to 4, "SPYL" refers to "same period last year." Additionally, FY2020 started on October 1, 2019 for the U.S. Postal Service. Accordingly, Week 41 corresponds to the week of July 5.

"asked the team to run the transportation on time and mitigate extra trips" in July

2020—*i.e.*, the Late Trip Policies—and then the service scores significantly declined.[95]

131.    As David Williams, former Vice Chair of the USPS Board of Governors, has

explained, these "service scores are probably the best objective measure and those are

significantly off."  This data is especially striking because of the decline in mail volume

during the COVID-19 pandemic, "where even though there's less mail, it's moving more

slowly—much more slowly."[96]

132.    Nor can the fall in service scores be attributed to personnel shortages

caused by the pandemic.  It is notable that, through the early months of the pandemic,

there was no appreciable drop in such scores.  They only collapsed following the

announcement of DeJoy's Late Trip Policies on July 10, 2020.

133.    Since DeJoy's "operational pivot," additional anecdotal reports of

substantial delays and disruptions in mail service have accumulated nationwide.

According to postal workers, DeJoy's policies are already resulting in "delivery delays of

*at least two days* across the country."[97]

---

[95] *Postmaster General Louis DeJoy Testimony Transcript August 24: House Oversight Hearing* at 3:49:09, Rev (Aug. 24, 2020), https://www.rev.com/blog/transcripts/postmaster-general-louis-dejoy-testimony-transcript-august-24-house-oversight-hearing.

[96] Congressional Progressive Caucus, *CPC Hearing on Attacks on the US Postal Service* at 1:29:14–1:29:25 (Aug. 20, 2020), https://www.facebook.com/USProgressives/videos/cpc-hearing-on-attacks-on-the-us-postal-service/1147601832293608/.

[97] Jessica Dean, Jessica Schneider, & Caroline Kelly, *Postal Service Says it has "Ample Capacity" to Handle Election After Trump Casts Doubt*, CNN (Aug. 3, 2020), https://www.cnn.com/2020/08/03/politics/postal-service-ample-capacity-election-trump/index.html (emphasis added).

134.    Multiple postal worker unions have affirmed that DeJoy's new policies are severely limiting mail transportation and causing mail to be left at sorting plants for days longer than typical.[98]  The American Postal Workers Union, "which represents more than 200,000 Postal Service employees and retirees, has received a number of reports from postal workers and customers" from mid-July to early August "that mail delivery has slowed and 'degraded.'"[99]

135.    On August 7, 2020, a "postmaster in upstate New York . . . told their union that the regular mail was two days behind and, for the first time in their career, Express Priority Mail was not going out on time."[100]  Similarly, Mark Dimondstein, the President of the American Postal Workers Union, reported that he has heard from several postal workers "who say Monday mail isn't going out until Wednesday and that in some jurisdictions on some days, mail isn't going out at all."[101]  Dimondstein makes clear the cause of the delays: "They're ordering workers to leave mail for another day."[102]  Indeed, at one post office, a postal clerk reports that under these new policies, "some mail is arriving a day later at the processing facility, where it could be delayed again."[103]

---

[98] Russell Berman, *What Really Scares Voting Experts About the Postal Service*, The Atlantic (Aug. 14, 2020), https://www.theatlantic.com/politics/archive/2020/08/how-postal-service-preparing-election/615271/.

[99] Dean, *supra* note 97.

[100] *See* Adam Clark Estes, *What's Wrong With the Mail*, Vox (Aug. 7, 2020), https://www.vox.com/recode/2020/8/7/21358946/postal-service-mail-delays-election-trump-mail-in-ballots.

[101] Berman, *supra* note 97.

[102] *Id.*

[103] Nelson, *supra* note 78.

136.    USPS employees and union representatives have expressed serious concerns about the impact of the recent changes on their ability to process and deliver mail in a timely manner.  In Maine, postal workers reported leaving 80,000 letters behind because they were not permitted to wait 10 minutes for them to be processed.[104] In Washington, D.C., hundreds of residents went two weeks without receiving any mail.[105]  And in New York, the president of a local chapter of the American Postal Workers Union reported that, as a result of the changes in service, "we've had entire towns that didn't get their mail that day," including "some of the bigger ones—East Aurora, Lancaster."[106]  There have been similar reports of delays in mail service throughout the country, including in Alabama, California, Colorado, Connecticut, Illinois, Maryland, Michigan, Minnesota, Missouri, Nevada, New Mexico, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Vermont, Washington, Wisconsin, and Virginia.[107]

---

[104] See Alison Durkee, *Postmaster General Acknowledges 'Unintended Consequences' of USPS Changes Causing Mail Delays,* Forbes (Aug. 14, 2020), https://www.forbes.com/sites/alisondurkee/2020/08/14/postmaster-general-louis-dejoy-acknowledges-unintended-consequences-of-usps-postal-service-changes-mail-delays/#764bfdf46052.

[105] Kolbie Satterfield, *Southwest DC Residents Go Weeks Without Mail Being Delivered*, WUSA9 (Aug. 13, 2020), https://www.wusa9.com/article/news/local/dc/two-weeks-no-mail-in-southeast-dc-neighborhood/65-31535798-3c83-45f8-b0e4-775ce6d6e8f8.

[106] Jerry Zremski, *Mail Delays, Days With No Delivery Prompt Rising Concern In WHY* (Aug 13. 2020), https://buffalonews.com/news/national/govt-and-politics/mail-delays-days-with-no-delivery-prompt-rising-concern-in-wny/article_d9944036-dd92-11ea-8f15-778f24015679.html.

[107] *See, e.g.*, *State of Washington v. Trump*, No. 1:20-cv-03127 (E.D. Wash. Aug. 8, 2020), https://agportal-s3bucket.s3.amazonaws.com/001_ComplaintUSPS.pdf; Andrew Brown & Andrew Miller, *Some SC Businesses Say They are Experiencing Delays Because of US Postal Service Changes*, The Post and Courier, (Aug. 14, 2020), https://www.postandcourier.com/business/some-sc-businesses-say-they-are-

137.    USPS has publicly acknowledged its own fears regarding its capability to handle on-time delivery of Election Mail submitted close to Election Day.  On July 29, 2020, after DeJoy's policies went into effect and noticeable service delays took place, USPS sent letters to 46 states and the District of Columbia, expressly stating that USPS "cannot guarantee all ballots cast by mail for the November election will arrive in time to be counted."[108]

138.    The July 29 letters warned that "there is a significant risk that, at least in certain circumstances, ballots may be requested in a manner that is consistent with your election rules and returned promptly, and yet not be returned in time to be counted." To account for that risk, USPS "recommend[ed] that election officials use First-Class Mail to transmit blank ballots and allow 1 week for delivery to voters," even though many states' election laws permit voters to request a ballot within one week of Election Day.  These letters make clear the "grim possibility for the tens of millions of Americans

experiencing-delays-because-of-us-postal-servicechanges/article_e8716d38-dd6d-11ea-9c9e-a79f1c82a446.html; Ellie Rushing, *Mail Delays are Frustrating Philly Residents, and A Short-Staffed Postal Service is Struggling to Keep Up*, Philadelphia Inquirer (Aug. 2, 2020), https://www.inquirer.com/news/philadelphia/usps-tracking-in-transit-late-mail-delivery-philadelphia-packages-postal-service-20200802.html; Lauren Walsh, *Central Alabama Experiences Some Mail, Package Delays as USPS, UPS Feel COVID-19 Impact*, ABC33/40 News (Aug. 12, 2020), https://abc3340.com/news/local/central-alabama-experiences-some-mail-package-delays-as-usps-ups-feel-covid-19-impact; Ron Trevino, *USPS Delivery Delays Leave 82-year-old Texas Man Without Heart Medication for a Week*, WBNS (Aug. 17, 2020), https://www.10tv.com/article/news/nation-world/usps-delays-leave-humble-man-withoutheart-medication/285-49815193-bf3d-4b45-a1a5-b0afe16236f7; David Manoucheri, *People Wait Weeks, Months for Packages to be Delivered*, KCRA, (Aug. 15, 2020), https://www.kcra.com/article/people-wait-weeks-months-for-packages-to-be-delivered/33606613; Ginna Roe, Utah Diabetic Waiting for More Than a Week For Supplies By Mail, KUTV, (Aug. 17, 2020); https://kutv.com/news/local/utah-diabetic-waiting-more-than-a-week-for-supplies-by-mail.

[108] Cox, *supra* note 12 (noting that USPS has "no objection" to the mail-in ballot plans of four states: Nevada, New Mexico, Rhode Island, and Oregon).

eligible for a mail-in ballot this fall: Even if people follow all of their state's election rules, the pace of USPS delivery may disqualify their votes."[109]

139.    On July 30, 2020, USPS spokesperson David Partenheimer acknowledged in a statement to the Washington Post that USPS's recent changes have resulted in "service impacts."[110] And in a subsequent letter to USPS workers on August 13, 2020, DeJoy himself acknowledged that delivery slowdowns were "unintended consequences" of his new policies.[111] Critically, it is "not entirely clear how temporary the delays will be."[112] And for now, the delays have continued. In particular, because of the Late Trip Policies, numerous pieces of mail are left behind at both processing plants and delivery centers, while the unavailability of overtime has left workers with insufficient hours to process and deliver mail, leading to larger and larger piles of left-behind mail.[113]

140.    In a hearing before the Senate Homeland Security and Governmental Affairs Committee on August 21, 2020, DeJoy again admitted that his recent changes are responsible for these delays across the United States: "Unfortunately, some mail did not . . . Our production processing within the plants was not fully aligned with this

---

[109] *Id.*

[110] Jacob Bogage, *Top Democrats Say Postmaster General Acknowledged New Policies That Workers Say Are Delaying Mail*, Wash. Post (Aug. 6, 2020), https://www.washingtonpost.com/politics/2020/08/06/top-democrats-say-postmaster-general-acknowledged-new-policies-that-workers-say-are-delaying-mail/.

[111] Cox, *supra* note 12.

[112] Estes, *supra* note 100.

[113] *See* Michael Sainato, *Postmaster General's Changes Causing Mail Delays, USPS Workers Say*, The Guardian (Aug. 16, 2020), https://www.theguardian.com/business/2020/aug/16/usps-mail-delays-postmaster-general-changes-workers; *see also* James Doubek, *Postal Workers Decry Changes And Cost-Cutting Measures*, KUOW (Aug. 11, 2020), https://kuow.org/stories/postal-workers-decry-changes-and-cost-cutting-measures.

established schedule.  So we had some delays in the mail.  And our recovery process in this should have been a few days and it's mounted to be a few weeks."[114]

141.    In discussing his implementation of the Late Trip Policies, DeJoy testified before the Senate that "[i]n transition there would be an issue"; that "certainly there was a slowdown in the mail -- when our production did not meet the schedule"; that "we feel bad about what the dip in our service, the level has been"; and that "we did not [do] as great a job as we should" in recovering from the "imbalances" created by the transition.[115]

142.    On August 24, 2020, DeJoy confirmed in his testimony before the House that, because "production schedules within the plants were not aligned with the transportation schedules going out," "about 10% of the mail was not aligned," which meant "[t]he production plants were getting done late, and the trucks were leaving."[116]

### B.    Defendants' Policies Have a Disparate Impact on Certain Categories of Voters Who Have No Reasonable Alternative Method of Voting Than By Mail.

143.    Because of the risks of voting in person during the COVID-19 pandemic, burdens on the ability to vote by mail impose a burden on all voters.

---

[114] *See* Sam Levine, *USPS Chief Concedes Changes Causing Delays But Won't Restore Sorting Machines*, The Guardian (Aug. 21, 2020), https://www.theguardian.com/us-news/2020/aug/21/usps-louis-dejoy-senate-hearing-mail-in-voting; *see also Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript* at 25:52–26:54, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[115] *See generally Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript,* Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[116] *Postmaster General Louis DeJoy Testimony Transcript August 24: House Oversight Hearing* at 4:48:14, Rev (Aug. 24, 2020), https://www.rev.com/blog/transcripts/postmaster-general-louis-dejoy-testimony-transcript-august-24-house-oversight-hearing.

144.    Still, some voters are more affected by the policies than others.  In particular, DeJoy's policies will have a disparate impact on certain categories of voters who have no way to effectuate their right to vote other than by use of USPS's services.

145.    First, the policies will have a disparate impact on voters whose states carry out all-mail elections.  Voters in Colorado, Hawaii, and Oregon not only face a receipt-by-Election-Day deadline—they also have no alternative to effectuate their right to vote without the threat of being disenfranchised by delay, because their states conduct elections entirely by mail.  And although Utah and California have postmark deadlines, they similarly have no alternative way to exercise their right to vote except by mail.

146.    Second, voters for whom COVID-19 poses an especially high health risk— and, in turn, for whom voting in person poses a risk of serious illness or death—have no alternative to effectuate their right to vote.  This includes older voters, voters with underlying medical conditions, and voters from racial and ethnic minority groups that the CDC has found have a disproportionately high incidence of such co-morbidities.

147.    Third, certain voters with disabilities cannot physically get to the polls at all, and would thereby rely on mail-in ballots even outside the strictures of the pandemic.  These voters have no alternative to effectuate their right to vote.

## VII.    Defendants Have Failed to Assert a Plausible Interest That Would Justify the Policy Changes.

148.    DeJoy has repeatedly reiterated two justifications for the policy changes: efficiency and cost.  Neither supplies a justification sufficient to outweigh the burden that Defendants' policies impose on the right to vote in the month preceding the election on November 3, 2020.  Moreover, the policy justifications appear to have been pretextual.

## A.     The Purported Justifications Cannot Withstand Scrutiny.

149.     In his Senate testimony, DeJoy repeatedly described the purpose of his measures as improving service and increasing the number of deliveries made on time.[117] For example, in response to questioning by Senator Rosen, DeJoy described the Late Trip Policies as follows:  "The only change that I made ma'am was that the trucks leave on time.  *Theoretically*, everyone should have got their mail faster. . . . The analysis that we did was that if we move the mail on schedule that all late deliveries would have been improved."[118]

150.     As Senator Rosen responded, "Obviously, that isn't the case."[119]  The USPS service scores charts pictured above highlight that delivery delays increased dramatically in the immediate aftermath of the Late Trip Policies.  *See supra*, section VI.A.  DeJoy's efficiency justification is further undermined by the ensuing reports of delays in mail service in Alabama, Colorado, Connecticut, District of Columbia, Illinois,

---

[117] *See, e.g.*, *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript,* Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript ("But the change that I made was run to our schedule, run to our transportation schedule. . . . Once we get all the mail on those trucks, that 97% to 98% of the mail that we move around the country will be getting to its destination point on time."); *id.* ("We're considering dramatic changes to improve the service to the American people."); *id.* ("I worked with the existing management team to create a new organization that would look to move forward and give us self-help and drive improvements in our service, drive cost out of the system, and grow revenues."); *id.* ("The analysis that we did was that if we move the mail on schedule that all late deliveries would have been improved."); *id.* ("And if we adhere to our schedules, that will improve performance."); *see also* https://www.politico.com/news/2020/08/21/louis-dejoys-opening-statement-senate-hearing-399941 ("While the improvements are dramatic, this effort did expose a need to realign some of our processing and scheduling that caused mail to miss the scheduled transportation, and has temporarily impacted mail and package service performance.").

[118] *Id.* (emphasis added).

[119] *Id.*

Maine, Maryland, Michigan, Minnesota, Missouri, Nevada, New Mexico, New York, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Vermont, Washington, Wisconsin, and Virginia. *See supra*, section III.C.

151. DeJoy himself acknowledged as much in his testimony before the Senate, conceding that "[i]n transition there would be an issue"; that "certainly there was a slowdown in the mail when-- our production did not meet the schedule"; that "we feel bad about what the dip in our service, the level has been"; and that "we did not [do] as great a job as we should" in recovering from the "imbalances" created by the transition.[120]

152. This rationale is equally deficient with respect to the sorting machines—though DeJoy asserted they "are not needed," his assertion is belied by the fact that delays are already soaring and the need for fast-paced sorting will only increase as the election draws nearer.

153. Even if DeJoy's policies would generate "longterm improvement" in efficiency,[121] that justification cannot support continuation of the policy in the month prior to the November election  There are only 68 days remaining until Election Day. The month prior to a presidential election that will be overwhelmingly carried out by mail is not the time to test run a new policy or the elimination of infrastructure and hope the kinks will iron out in time.

---

[120] *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript*, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[121] *Id.* (statement of Sen. Johnson).

154.    The remaining justification DeJoy offers is cost.[122]  This justification fails to support the continued enforcement of the Late Trip Policies because it is overbroad. USPS's desire to implement cost-cutting measures from October 15 through November 15 is not justified by its need to effectuate a certain annualized savings.  USPS could still cut costs by implementing these policies *after* the election, when they would not endanger the right to vote.

155.    Because the burden on the Plaintiffs' right to vote is at its zenith in the month before the election—when most people are submitting their ballots and the risk of delay becomes more likely to result in the ballot not being counted—USPS's limited fiscal savings in one month's time cannot justify the infringement on Plaintiffs' right to vote.  *See, e.g.*, *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969) (although the government "has a valid interest in preserving the fiscal integrity of its programs," it "may not accomplish such a purpose by" violating its citizens' fundamental rights); *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973) ("[A]lthough efficacious administration of governmental programs is not without some importance, 'the Constitution recognizes higher values than speed and efficiency.'").

---

[122] *See, e.g., id.* ("And together, we reorganized the organization to move forward on process improvements, improving service and garnering new business, new revenue and costs."); *id.* ("Late deliveries, late dispatch, extra trips, and all the time and costs associated around this that approximated $4 billion. We were facing, this was before we had the note, I had $13 billion in cash and $12.5 billion of payments to make in the next nine months. And no help insight. We had no help in sight. So I needed to look at a positive impact on cost savings that improved the business."); *see also* https://www.politico.com/news/2020/08/21/louis-dejoys-opening-statement-senate-hearing-399941 ("Some may ask, why does the Postal Service need to transform? To that question, I say that while I am optimistic about the future of the Postal Service, I am also a realist, and am keenly aware of the magnitude of the financial challenges we face.").

**B.    The Purported Justifications Are Pretextual.**

156.    DeJoy's justifications are pretextual.  As noted above, the President's own statement makes clear that the real purpose of the Challenged Policies is to frustrate mail balloting.  While President Trump's statements were made in the context of a dispute regarding funding USPS, he expressly linked that lack of funds to USPS's inability to handle the volume of mail ballots that are anticipated in the November election.[123]

157.    Although the USPS has sought to justify the Challenged Policies by contending that it has insufficient funds, the President has stated both (a) that he opposes any increase in funding, and (b) that ***the consequence*** of the funding deficit will be the frustration of mail balloting.  When one adds the voluminous evidence of President Trump's opposition to mail balloting, it is reasonable to infer that ***the reason*** he has opposed an increase in funding for USPS is to effectuate his goal of blocking mail balloting.

158.    DeJoy's own statements also support a finding of pretext.  After vigorously defending his policy changes on fiscal grounds, DeJoy curiously diverted from the cost rationale in one specific context:  the very funding from Congress that the President opposes.  Senator Scott asked DeJoy:  "do you feel like you need a massive federal bailout [to] be able to deliver the mail on Election Day?"  DeJoy said:  "No. I do not need

_____

[123] Ellie Kaufman et al., *Trump says he opposes funding USPS because of mail-in voting*, CNN (Aug. 13, 2020), https://www.cnn.com/2020/08/13/politics/trump-usps-funding-comments-2020-election/index.html (emphasis added) ("But if they don't get those two items that means you can't have universal mail-in voting because you *[sic]* they're not equipped to have it.").

a massive--I don't need anything to deliver mail on-- election night."[124]  Turning down

an alternative source of funding that would impose no burden on the right to vote

indicates that the policies are *designed* to impose a burden on voting rights and not to

stabilize USPS's finances.

## CAUSES OF ACTION

## COUNT I

### (*Ultra Vires* Agency Action — Violating the Clear Command of Section 3661 of the Postal Reorganization Act)

159.    Plaintiffs re-allege and incorporate by reference each allegation contained

in the preceding paragraphs as though fully set forth herein.

160.    USPS has a clear, indisputable, and non-discretionary duty to request an

advisory opinion from the Postal Regulatory Commission before making "any change in

the nature of postal services which will generally affect service on a nationwide or

substantially nationwide basis."  39 U.S.C. § 3661(b) ("When the Postal Service

determines that there should be a change in the nature of postal services which will

generally affect service on a nationwide or substantially nationwide basis, it shall submit

a proposal, within a reasonable time prior to the effective date of such proposal, to the

Postal Regulatory Commission requesting an advisory opinion on the change.").

161.    USPS's discharge of its duty to request an advisory opinion, initiates a

notice and comment period.  After USPS's request, the Commission must offer "an

opportunity for hearing on the record," under the process established by the

---

[124] *Senate Homeland Security and Governmental Affairs Committee Hearing on USPS Operations During COVID-19 and the Elections*, CQ Congressional Transcripts, (Aug. 21, 2020), https://plus.cq.com/alertmatch/454024321?0&deliveryId=64865645&uid=congression altranscripts-5990233&utm_medium=alertemail&utm_source=alert&openinplus=true.

Administrative Procedure Act, for the benefit of and to receive comments on the proposal from "the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public." 39 U.S.C. § 3661(c).

162.     Plaintiffs are "users of the mail" under 39 U.S.C. § 3661(c).

163.     Defendants' Late Trip Policies have affected and will affect postal services on a nationwide or substantially nationwide basis.

164.     Defendants did not request of the Postal Regulatory Commission an advisory opinion "prior to" implementing the Late Trip Policies described herein that have affected or will affect postal services on a nationwide or substantially nationwide basis, violating the clear and indisputable command of § 3661.

165.     Defendants acted *ultra vires* when they issued the Late Trip Policies described herein without abiding the clear and indisputable command of § 3661.

166.     As users of the mail, Plaintiffs have a clear and indisputable right to Defendants' compliance with the requirements of § 3661.

167.     Because of Defendants' actions in violation of § 3661, Plaintiffs have been denied the opportunity to comment during a hearing under procedures required by § 3661(c) on the Late Trip Policies and other changes affecting postal services on a nationwide or substantially nationwide basis, as described herein, before their implementation.

168.     Nonstatutory judicial review is available in this Court.[125]

---

[125] There is no possibility for judicial review by this Court or another Court under the Administrative Procedure Act or any other specific or general statutory review provision. *See Mittleman v. Postal Reg. Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014)

169. The Postal Regulatory Commission may receive complaints about Defendants' failure to comply with § 3661. However, § 3661 sets out no requirement that a user of the mail pursue relief before the Commission prior to filing suit. Moreover, this Court's review would forestall irreparable injury to Plaintiffs because the election in which they plan to vote by mail will occur in 68 days, but the Commission is under no obligation to resolve complaints until they have been pending for at least 90 days. *See* 29 U.S.C. § 3662(a)(1). This Court's review is also warranted and required because it can offer remedies not available before the Commission and for reasons of judicial economy.

170. Plaintiffs will suffer irreparable injury if the changes described herein take effect without Defendants' compliance with § 3661.

171. The public interest favors declaring unlawful the changes to postal services that Defendants have implemented without observing the requirement of § 3661.

172. For these reasons, Plaintiffs are entitled to (1) a declaration that Defendants acted unlawfully by adopting changes in violation of § 3661; (2) an order directing Defendants to "submit a proposal . . . to the Postal Regulatory Commission requesting an advisory opinion on the" changes described herein; and (3) an injunction barring Defendants and their agents from implementing the Late Trip Policies without first receiving an advisory opinion from the Postal Regulatory Commission.

---

("[W]e have observed that the Postal Service is exempt from review under the Administrative Procedure Act." (quotation marks omitted)).

**COUNT II**

**(Undue Burden on the Right to Vote in Violation of the U.S. Constitution)**

173.    Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

174.    The United States Constitution guarantees that "all qualified voters have a constitutionally protected right to vote . . . and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

175.    This fundamental right to vote is rooted in "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). These protections are typically articulated as First and Fourteenth Amendment rights in suits against state actors. *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Here, the First and Fifth Amendments provide the same guarantees and forbid the federal government from imposing undue burdens on the right to vote.

176.    Under the *Anderson-Burdick* line of cases, the government cannot unreasonably burden the right to vote—if the character and magnitude of the injury inflicted upon voting rights outweighs the state interests justifying the challenged restriction, then the restriction is unconstitutional.

177.    Defendants' actions, as described herein, including the Challenged Policies and other changes to USPS capacity since DeJoy was appointed Postmaster General, will and have unreasonably and severely burdened Plaintiffs' right to vote by causing delays that effectively disenfranchise voters.

178.    In evaluating burdens on the right to vote, a "majority of the *Crawford* Court determined that '[i]t matters . . . whether the effects of a facially neutral and nondiscriminatory law are unevenly distributed across identifiable groups.'" *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018).[126]

179.    The burden imposed by the Challenged Policies is especially severe for individuals who have no reasonable alternative method to exercise their right to vote, including (i) voters in states that conduct elections entirely by mail; (ii) voters with disabilities who cannot physically get to their polling place; and (iii) voters who face increased risk of serious illness or death from voting during the COVID-19 pandemic, such as voters with underlying medical conditions, older voters, and voters from racial and ethnic minority groups.

180.    Defendants' actions are not justified by any legitimate governmental interest.  As a result of the actions described herein, Defendants have violated and continue to violate the U.S. Constitution's protections against undue burdens on the right to vote.

---

[126] *See also Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) (explaining that Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment").

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs request that this Court enter a judgment against Defendants and award Plaintiffs the following relief:

A. A declaration that USPS has violated the requirements of 39 U.S.C. § 3661 by making a change or changes "in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," as described herein, without first requesting an advisory opinion of the Postal Regulatory Commission, thereby denying "users of the mail" the opportunity to participate in a "hearing on the record" before the Postal Regulatory Commission about the proposed changes before implementation;

B. A writ of mandamus to compel USPS to discharge its duty to request an advisory opinion of the Postal Regulatory Commission on any and all proposed "changes in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," as described herein, before implementing any such proposed changes;

C. Preliminary and permanent injunctions barring Defendants and their agents, officers, employees, and successors, and all persons acting in concert with each or any of them or under their direction from implementing any and all "changes in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" that are planned, were adopted, and/or have been implemented without the Postal Service discharging its duty to request an advisory opinion of the Postal Regulatory Commission regarding any such proposed changes;

D. Vacatur of any agency action, order, notice, decision, or policy statement issued by Defendants or their agents, officers, employees, and successors, or any persons acting in concert with each or any of them or acting under their direction that implement or purport to implement any and all "changes in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," as described herein, that are planned, were adopted, and/or have been implemented without USPS discharging its duty to request an advisory opinion of the Postal Regulatory Commission regarding such proposed changes;

E. A declaration that Defendants' actions, as described herein, violated the First Amendment to the United States Constitution.

F. A declaration that Defendants' actions, as described herein, violated the Fifth Amendment to the United States Constitution.

G. Preliminary and permanent injunctions barring Defendants and their agents, officers, employees, and successors, and all persons acting in concert with each or any of them or under their direction from enforcing any policies that unreasonably burden the fundamental right to vote, including the Challenged Policies;

H. Appointment of an independent monitor to oversee Defendants' compliance with the terms of the Court's order;

I. Award Plaintiffs reasonable costs, including reasonable attorneys' fees; and

J. Any and all additional relief that this Court deems just and proper.

Respectfully submitted,

 /s Shankar Duraiswamy

Shankar Duraiswamy (D.C. Bar No. 501702)
Megan C. Keenan (D.C. Bar No. 1672508)
Sarah Suwanda (D.C. Bar No. 1685531)
Virginia Williamson (D.C. Bar No. 187220)
James M. Smith (D.C. Bar No. 987082)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
sduraiswamy@cov.com
mkeenan@cov.com
ssuwanda@cov.com
vwilliamson@cov.com
jmsmith@cov.com

Robert D. Fram*
Diane Ramirez*
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
rfram@cov.com
dramirez@cov.com

John Fraser*
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
jfraser@cov.com

Date: August 28, 2020          *Pro Hac Vice forthcoming