# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**Vote Forward, et al.**

Plaintiffs,

v.

Case No. 20-cv-2405

**Louis DeJoy,** in his official
capacity as the Postmaster General; and the
**United States Postal Service,**

Defendants.

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ....................................................................................................... 3

I.       The United States Postal Service ..................................................................... 3

II.      USPS's Handling of Election Mail ................................................................. 4

         A.      State, Local, and Individual Responsibilities for Election Mail ............. 6

         B.      USPS's Efforts to Ensure Timely Delivery of 2020 Election Mail ........ 8

                 1.      USPS Outreach and Recommendations to Election Officials .................... 8

                 2.      USPS's Longstanding Special Measures for Election Mail .................... 11

                 3.      USPS's Increased Efforts in Support of the Election .............................. 13

III.     USPS's Years-Long Mandate to Improve Efficiency and Control Expenses.................. 14

         A.      Periodic, Data-Based Reduction in Redundant Processing Equipment and
                 Collection Boxes .................................................................................. 15

         B.      USPS's Continued Focus on Adherence to Existing Transportation
                 Schedules ............................................................................................. 17

         C.      USPS Personnel Practices Related to Overtime Usage and Staffing
                 Shortages Caused by the Covid-19 Pandemic ...................................... 20

                 1.      Overtime ............................................................................................... 20

                 2.      The Impact of the COVID-19 Pandemic ............................................... 20

         D.      Other Efforts Aimed at Improving Efficiency ...................................... 21

IV.      Procedural History ........................................................................................ 22

STANDARD OF REVIEW ...................................................................................... 22

ARGUMENT .......................................................................................................... 23

I.       PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF ITS
         CLAIMS. ...................................................................................................... 23

         A.      Plaintiffs Lacks Article III Standing .................................................... 23

       1.      The Organization Plaintiffs Cannot Establish Standing to Sue in Their Own Right. ...................................................................................... 24

       2.      The Individual Plaintiffs Cannot Establish a Cognizable Injury Since They Rely Only on a Speculative Allegation that Purported USPS Policy Changes Will Affect Their Ability to Vote by Mail. .......... 26

  B.    Plaintiffs are Unlikely to Succeed on the Merits of Their Anderson-Burdick Right-to-Vote Claim. ............................................................... 27

       1.      Anderson-Burdick Does not Apply to the Alleged USPS Policy Changes at issue. ...................................................................................... 29

           i.      Anderson-Burdick applies only to election laws. ......................... 29

           ii.     Even if the Court finds that the alleged USPS policy changes are subject to Supreme Court election law jurisprudence, *McDonald* would apply here, not Anderson-Burdick, and so the USPS policy changes would be subject to the rational basis test. .............................................................. 31

       2.      Even if Anderson-Burdick Applies, the USPS Policy Changes are Still Constitutional. ................................................................................... 32

II.     PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM .......................... 34

III.   THE BALANCE OF THE EQUITIES DOES NOT JUSTIFY RELIEF. ........................ 37

CONCLUSION ..................................................................................................... 38

# TABLE OF AUTHORITIES

**CASES**

*Ajilon Prof. Staffing, PLC v. Kubicki*,
  503 F. Supp. 2d 358 ............................................................................................ 23

*Al-Aulaqi v. Obama*,
  727 F. Supp. 2d 1 (D.D.C. 2010) ....................................................................... 26

*Am. Soc'y of Prevention of Cruelty to Animals v. Feld Ent. Inc.*,
  659 F.3d 13 (D.C. Cir. 2011) ............................................................................. 25

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) .............................................................................. 29, 30, 32

*Burdick v. Takushi*,
  504 U.S. 428 (1992) .............................................................................. 29, 30, 32

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
  58 F.3d 738 (D.C. Cir. 1995) ............................................................................. 23

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .................................................................................. 24, 26, 27

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004) ........................................................................... 22

*Columbia Hopsital for Women Found v. Bank of Tokyo-Mitsubishi, Ltd.*,
  15 F. Supp. 2d 1 (D.D.C. 1997) ......................................................................... 23

*Crawford v. Marion Cty. Election Bd.*,
  553 U.S. 181 (2008) ........................................................................................... 28

*Ctr. for Responsible Sci. v. Hahn*,
  809 F. App'x 10 (D.C. Cir. 2020) ...................................................................... 25

*Democratic Exec. Comm. of Fla. v. Lee*,
  915 F.3d 1312 (11th Cir. 2019), *denying mot. to vacate*, 950 F.3d 790 (11th Cir. 2020) ........ 31

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017), *cert. denied*, 139 S. Ct. 791 (2019) ...................... 25

*F.C.C. v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993) ........................................................................................... 34

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) .................................................................... 24, 25

*Griffin v. Roupas*,
　385 F.3d 1128 (7th Cir. 2004) ................................................. 28

*Havens Realty Corp. v. Coleman*,
　455 U.S. 363 (1982) ................................................................. 24

*In re Navy Chaplaincy*,
　738 F.3d 425 (D.C. Cir. 2013) ............................................... 23

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
　933 F. Supp. 2d 58 (D.D.C. 2013) .................................... 22, 23

*Kramer v. Union Free Sch. Dist. No. 15*,
　395 U.S. 621 (1969) ................................................................. 28

*League of Women Voters of United States v. Newby*,
　838 F.3d 1 (D.C. Cir. 2016) ................................................... 35

*Libertarian Party v. D.C. Bd.of Elections & Ethics*,
　682 F.3d 72 (D.C. Cir. 2012) ................................................. 33

*Mays v. LaRose*,
　951 F.3d 775 (6th Cir. 2020) .................................................. 28

*McDonald v. Board of Election Com'rs of Chicago*,
　394 U.S. 802 (1969) ................................................................. 31

*Minnesota v. Clover Leaf Creamery Co.*,
　449 U.S. 456 (1981) ................................................................. 34

*Nat'l Taxpayers Union, Inc. v. United States*,
　68 F.3d 1428 (D.C. Cir. 1995) .......................................... 24, 25

*Nken v. Holder*,
　556 U.S. 418 (2009) ................................................................. 23

*Norton v. S. Utah Wilderness All.*,
　542 U.S. 55 (2004) ................................................................... 37

*Open Communities All. v. Carson*,
　286 F. Supp. 3d 148 (D.D.C. 2017) ....................................... 35

*Power Mobility Coalition v. Leavett*,
　404 F. Supp. 2d 190 (D.D.C. 2005) ....................................... 35

*Powers v. Ohio*,
　499 U.S. 400 (1991) ................................................................. 26

*Rosario v. Rockefeller*,
410 U.S. 752 (1973) ................................................................................ 32, 33, 35

*Singh v. Carter*,
185 F. Supp. 3d 11 (D.D.C. 2016) ........................................................................ 23

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ........................................................................................ 24

*Texas Democratic Party v. Abbott*,
961 F.3d 389 (5th Cir. 2020) ............................................................................. 28

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997) ........................................................................................... 29

*U.S. R.R. Ret. Bd. v. Fritz*,
449 U.S. 166 (1980) ........................................................................................... 34

*W. Wood Preservers Inst. v. McHugh*,
925 F. Supp. 2d 63 (D.D.C. 2013) ...................................................................... 26

*Wash. State Grange v. Wash. State Republican Party,*
552 U.S. 442 (2008) ........................................................................................... 29

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*,
No. CV 20-1630 (JEB), 2020 WL 5232076 (D.D.C. Sept. 2, 2020) ....................... 36

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......................................................................................... 22, 23

*Wisc. Gas Co. v. F.E.R.C.*,
758 F.2d (D.C. Cir. 1985) ............................................................................. 34, 35

## STATUTES

39 U.S.C. § 202 .................................................................................................... 4

## OTHER AUTHORITIES

Congressional Briefing (Aug. 31, 220),
https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf .......... 19

*Number of Voters and Voter Registration as a Share of the Voter Population*,
https://www.kff.org/other/state-indicator/number-of-voters-and-voter-registration-in-thousands-as-a-share-of-the-voter-population/?current
Timeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22
sort%22:%22asc%22%7D ................................................................................... 4, 5

Service Performance Rebounds at Postal Service (Aug. 31, 2020),
    https://about.usps.com/newsroom/national-releases/2020/0831-service-performance-rebounds-
    at-postal-service.htm ........................................................................................................... 19

USPS Service Performance Continues Upward Trend (Sept. 10, 2020),
    https://about.usps.com/newsroom/national-releases/2020/0910-usps-service-performance-
    continues-upward-trend.htm ................................................................................................ 19

## INTRODUCTION

This case is not about whether the United States Postal Service ("USPS") will be able to meet the burdens imposed by individuals who intend to vote by mail in the November 2020 election (the "Election"). Just as it has in past elections, USPS has taken, and will continue to take, a number of efforts to ensure that ballots move quickly and efficiently through the mail. Such efforts include encouraging state officials to appropriately identify and mark ballots to facilitate proper treatment of Election Mail; asking voters to mail their ballots as soon as they are able; and then tracking (where possible), monitoring, and moving the ballots as expeditiously as possible. Nothing has changed in USPS's approach to Election Mail from past years, except that USPS has put in place *even more* processes to monitor and move these ballots in response to the major increase in Election Mail volume caused by the COVID pandemic. Indeed, to avoid any doubt about USPS's ability to meet its responsibilities, it has suspended a number of routine, long-standing operational activities—implemented *before* Postmaster General DeJoy's tenure—until after the Election.

In light of these publicly expressed commitments, this case is now about Plaintiffs' attempts to have this court oversee the day-to-day operations of USPS, based on the unprecedented legal theory that potential mail delays caused by the alleged USPS policy changes may unconstitutionally violate citizens' right to vote. Plaintiff's legally deficient claim, arising from unsupported fears about the potential actions of USPS, does not warrant the extraordinary relief it seeks.

First, the Plaintiffs fail to establish standing. Four of the Plaintiffs are social interest organizations which have identified no concrete injury to their organizational activities. Although all assert that they have invested resources to educate persons in response to the purported USPS

policy changes, D.C. Circuit precedent makes clear that such expenditures, which are entirely consistent with the organizations' advocacy goals, are insufficient for standing. And even if these Plaintiffs could establish a cognizable injury, they have still failed to establish third-party standing to bring their constitutional claim (which implicates rights belonging to citizens, not organizations).

Additionally, the individual Plaintiffs cannot establish standing because they have failed to demonstrate any concrete, impending injury. Although they assert they will vote by mail in the upcoming election, they can only speculate whether that vote will be impacted by any potential delays in the mail. Indeed, Plaintiffs themselves can control the likelihood of their injury by promptly requesting and returning their ballots, rather than waiting to a point where a delay may injure them. But even if they fail to promptly request and return their ballots, there is no allegation that the alleged mailing delays will affect their ballots in particular, as opposed to ballots mailed by others, or whether the mail may be delayed by factors (such as the pandemic) that are unaffected by their requested relief. Thus, the Plaintiffs fail to establish standing.

Furthermore, Plaintiffs cannot show that they are likely to prevail on the merits of their Constitutional right-to-vote claim. To start, Plaintiffs' theory is inconsistent with established case law. Plaintiffs claim that the alleged USPS policy changes will create mail delays, requiring those voting by mail to promptly return their ballots, lest their votes go uncounted. But courts have repeatedly held that there is no constitutional right to vote by mail, and that States may decline to allow mail-in voting altogether. If a State can *prohibit* mail-in voting, then a policy that may *restrict* when persons must mail in their ballots cannot be unconstitutional. Regardless, Plaintiffs' legal theory fails for a number of other reasons. Plaintiffs rely on a legal framework—the *Anderson-Burdick* balancing test—that has been applied only in the context of laws passed to

regulate elections themselves, not to any and every policy which may indirectly affect the electoral process. And even if the USPS policy changes may somehow constitute "election laws," such that the *Anderson-Burdick* balancing test would be applicable, those changes would be subject only to rational basis review, which they undoubtedly survive.

Furthermore, Plaintiffs cannot establish the other prerequisites for a preliminary injunction, including that any irreparable injury must be "certain and great." Plaintiffs' injuries consist of either voluntary expenditures consistent with their standard activities, or speculative and unjustified concerns over future mail deliveries. And finally, the balance of the equities and the public interest support allowing USPS to manage its operations as efficiently and effectively as possible, so it can meet the many burdens placed upon it in advance of the upcoming election. Those equities do not support placing USPS under judicial receivership, with that election only weeks away.

## **BACKGROUND**

### *I.     The United States Postal Service*

USPS is a self-supporting, independent establishment of the executive branch, responsible for providing postal services throughout the United States. USPS has the authority to, among other things, designate mail routes and construct or designate post offices with the authority to carry, deliver, and regulate mail for the entire country. It is one of the nation's largest and most complex business operations. USPS employs more than 630,000 employees; operates more than 31,000 Post Offices; utilizes more than 204,000 delivery vehicles and 8,500 pieces of automated processing equipment; and typically processes and delivers more than 450 million mailpieces to nearly 160 million delivery points in a *single* day. *See* Ex. 1 (USPS FY2019 Annual Report to Congress) at 2, 7.

The Board of Governors of USPS, which is comparable to the board of directors for a publicly held corporation, directs the exercise of powers of USPS, including, among other things, long-range planning, oversight of service standards, management of expenditures, and review of policy and practices. The Board of Governors is composed of 11 appointed members. 39 U.S.C. § 202. Of them, nine Governors are appointed by the President, by and with the advice and consent of Senate, and not more than five of those nine may be of the same political party. *Id.* The nine Governors select the Postmaster General, who becomes a member of the Board, along with a Deputy Postmaster General. The PRC, an independent agency, has regulatory oversight over USPS.

Louis DeJoy is the 75th Postmaster General and Chief Executive Officer of USPS. The Governors appointed Postmaster General DeJoy on May 6, 2020. He assumed office on June 16, 2020.

## II.     USPS's Handling of Election Mail

"Election Mail" is defined by USPS as any item mailed to or from authorized election officials that enables citizens to participate in the voting process. *See* Declaration of Robert Glass ("Glass Dec.") ¶ 3. This includes mail sent by election officials to voters (*e.g.*, voter registration materials, mail-in ballot applications, polling place notifications, blank ballots), and mail returned by voters to election officials (*e.g.*, completed ballots, completed registration or ballot applications).[1] *Id.* USPS regards Election Mail as having special importance.

The USPS has determined that it is fully capable—both financially and operationally—of handling a surge of Election Mail in connection with the November Election. By its analysis, even

---

[1] Election Mail is distinct from "Political Mail" sent by political candidates, political action committees, and similar organizations in order to engage in advocacy. Glass Dec. ¶ 3.

if every registered voter in the United States[2] used a mail-in ballot to cast a vote in the Election, the associated mail volume would represent only a small fraction of the total mailpieces that the USPS processes each week, on average, *id.* ¶ 42, and would pale in comparison to spikes in mail volume that the USPS handles every winter holiday season. *Id.* ¶ 43; Declaration of Jason DeChambeau ("DeChambeau Dec.") ¶ 23. Indeed, USPS projects (even accounting for an increased use of mail-in ballots to compensate for COVID-19-related mitigation efforts) that only two to five percent of the total mail volume in October and November 2020 will be Election Mail. Glass Dec. ¶ 42; DeChambeau Dec. ¶ 23. As detailed below and in USPS's declarations and public statements, USPS has been planning for the November Election for many months, and has the funds, processing capacity, and personnel to ensure that Election Mail is timely delivered. Glass Dec. ¶¶ 42-44.[3]

Beyond these financial and operational resources, USPS will continue to employ longstanding practices to facilitate the use of Election Mail by states, and to enhance USPS's handling of Election Mail. These include extensive outreach to state and local election officials to support effective use of postal services to facilitate the distribution and return of ballots; publishing and distributing the official Election Mail kit (which provides a comprehensive guide to services,

---

[2] Publicly available data generally indicate that there are approximately 150 million registered voters in the United States. *See, e.g.*, *Number of Voters and Voter Registration as a Share of the Voter Population*, https://www.kff.org/other/state-indicator/number-of-voters-and-voter-registration-in-thousands-as-a-share-of-the-voter-population/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Sept. 10, 2020).

[3] *See also* Postmaster General Louis DeJoy's Opening Remarks for the USPS Board of Governors Meeting (Aug. 7, 2020) (Ex. 3) at 4 ("[T]he Postal Service has ample capacity to deliver all election mail securely and on-time in accordance with our delivery standards, and we will do so."); Testimony of Postmaster General Louis DeJoy Before the Senate Homeland Security and Governmental Affairs Committee on USPS Operations During COVID-19 and the Elections (Ex. 5) at 54 ("[W]e have plenty of cash to operate for the election.").

resources, and recommendations for Election Mail) to approximately 11,500 state and local election officials; offering official Election Mail markings to improve the visibility and ensure proper handling of Election Mail; and, as the attached declarations further detail, taking extraordinary steps to ensure the timely delivery of Election Mail for the upcoming election. *See* Glass Dec. ¶¶ 3-41. Further, due to the unprecedented demands of the election, the Board of Governors has established a bipartisan Election Mail Committee to actively oversee USPS's support of Election Mail for the Election. *Id.* at ¶ 10. USPS has demonstrated, both in its public representations and in practice, its commitment to continuing its longstanding practice to facilitate and expedite the timely delivery of Election Mail this year.

### A. State, Local, and Individual Responsibilities for Election Mail

Notwithstanding USPS's longstanding commitment to the timely delivery of Election Mail, election officials and voters bear significant responsibility in the successful utilization of postal services for the Election. USPS lacks authority over the critical decisions committed by law to states and local election officials regarding their Election Mail policies and procedures. *Id.* ¶ 4. Generally, each state determines whether, and to what extent, to allow domestic voters to cast their votes by mail. If mail-in voting is allowed, either the legislature or state and local election officials, if so authorized, and must choose whether to send Election Mail to voters via either First-Class Mail, which is typically delivered in two to five days, or lower-cost Marketing Mail, which is typically delivered in three to ten days. *Id.* ¶ 4; *see also* Ex. 4 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R20, "Processing Readiness of Election and Political Mail During the 2020 General Elections" (Aug. 31, 2020)). Regardless of what class of mail election officials use to mail ballots out *to* voters, all ballots returned by mail to election officials *from* voters are First-Class Mail, unless a voter sends it using a premium service with faster delivery standards (*i.e.* Priority Mail or Priority Express Mail). Ex. 4 at 1; Glass Dec. ¶ 4. USPS has not altered, nor

will it alter, any of its existing postal services, delivery standards, or rates applicable to the delivery of Election Mail in advance of the Election. *See, e.g.*, Ex. 5 (Transcript of Senate Homeland Security and Governmental Affairs Committee Hearing on USPS Operations During COVID-19 and the Elections (Aug. 21, 2020)) at 18 ("[W]e are not going to change any rates."); Ex. 3 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R20, "Processing Readiness of Election and Political Mail During the 2020 General Elections*" (Aug. 31, 2020)) at 4 ("We have delivery standards that have been in place for many years. These standards have not changed").

State legislatures, or election officials if delegated such authority, also have the responsibility for making key decisions that directly impact mail-in voting. Within the constraints of state and federal law, state and local election officials determine, among other things: (1) the design of Election Mail (its dimensions and the graphic and textual elements that will be displayed); (2) whether they will sufficiently mark Election Mail to enable USPS to identify and expeditiously process Election Mail for handling and delivery; (3) deadlines for voters to request and return mail-in ballots; (4) when Election Mail will be sent to voters; (5) whether Election Mail will be trackable (for example, using USPS's Intelligent Mail barcode system); and (6) whether to pre-pay postage the return postage for completed ballots from voters (versus requiring voters to affix their own postage). Glass Dec. ¶ 4. Individual voters are responsible for, among other things, providing current addresses to election officials; understanding mail-in voting procedures in their state and locality; and timely requesting ballots from, and returning those ballots to, election officials.

USPS's most significant operational concerns with respect to the Election are those elements controlled by the states themselves, either through legislation or state and local election officials and voters, not USPS. *Id.* ¶ 45. Indeed, when reviewing an audit of the special and primary

elections in May and June 2020, the USPS Office of Inspector General ("OIG") concluded that USPS had improved several of its practices and procedures since prior OIG audits and had appropriately adjusted its processes to facilitate the timely processing of Election Mail to meet the needs of the elections. Ex. 4 at 3, 12. OIG identified, however, several "potential concerns" that may affect the smooth functioning of Election Mail (*i.e.* ballots mailed without tracking technology, ballot mailpiece design, Election Mail sent to voters too close to the election, varying state postmark requirements for ballots, and out-of-date voter addresses)—none of which are controlled by USPS.

### B. USPS's Efforts to Ensure Timely Delivery of 2020 Election Mail

In preparation for the Election, USPS has undertaken extensive, expanded efforts to help election officials and voters in the planning and preparation of Election Mail, strongly encourage election officials, voters, and USPS employees to implement best practices, reinforce existing policies and procedures for handling Election Mail with USPS employees, and prepare to process and deliver a high volume of Election Mail.

### 1. USPS Outreach and Recommendations to Election Officials

USPS has demonstrated its commitment to provide election officials with the tools necessary to use the U.S. Mail as a secure, efficient, and effective way to facilitate the election process. In support of the Election, USPS has already had approximately 42,000 contacts to confer and advise state and local election officials regarding Election Mail best practices and recommendations, and this outreach is ongoing. Glass Dec. ¶¶ 5-9. Additionally, since February 2020, the outreach strategy has included distributing approximately 11,500 copies of "Kit 600," an official Election Mail guide; offering mailpiece design services; designating Election Mail Coordinators to serve each locality; and publishing extensive election-related information and guidance online. *Id.* ¶ 6; *see also* Ex. 6 (USPS 2020 Election Mail – Kit 600). This outreach

strategy in the run-up to the 2020 Election is consistent with USPS's outreach efforts in past election years. The principal distinction between this year's effort and those of previous election years is that the volume and frequency of USPS's communications have *increased* to address challenges stemming from the COVID-19 pandemic. Glass Dec. ¶ 32.

In May and July 2020, following dissemination of Kit 600, the USPS General Counsel's office sent letters to election officials to follow up and emphasize key aspects of the USPS's process and recommendations so that they may be taken into account when educating the public on voting by mail. Glass Dec. ¶ 7 & Glass Dec. Ex. 1. USPS tailored the July 2020 letters to each state, identifying key provisions of each state's election laws and procedures and relevant considerations for the timely, effective use of U.S. Mail to facilitate the voting process. *See generally* Ex. 15 (July 29, 2020 USPS Letter). For example, in its letter to Arkansas election officials, USPS cited provisions of state election law that "are incongruous with [USPS] delivery standards" and "create[] a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted." *Id.* at 1. USPS implored Arkansas election officials, as it did all other state and local election officials, to "keep the Postal Service's delivery standards and recommendations in mind when making decisions as to the appropriate means used to send a piece of Election Mail to voters, and when informing voters how to successfully participate in an election" by mail. *Id.* at 2. None of the letters sent to state and local election officials by USPS stated that USPS intended to slow or delay delivery of Election Mail, or that USPS was otherwise altering its service standards for Election Mail. Rather, these letters aimed to ensure that election officials are fully informed, well in advance of the Election, of USPS's delivery standards, the extensive resources that USPS offers to assist election officials, and the potential risks that local ballot-request or ballot-return deadlines may pose to voters' full participation by mail in the

Election. *See* Ex. 1; *see generally* Ex. 15. Moreover, these letters were consistent with USPS's outreach to election officials during past election cycles. *See, e.g.*, Glass Dec. ¶ 8 & Glass Dec. Ex. Ex. 2 (Sept. 23, 2016 letter to state election officials advising them, for example, to consult with USPS Election Mail Coordinators, urge voters to return ballots one week early in order to ensure timely delivery, use the official USPS Election Mail markings, and send Election Mail by First-Class Mail).

In all of its communications regarding 2020 Election Mail, USPS has strongly, and repeatedly, recommended that election officials adopt USPS best practices, including the following[4]:

- Consult with USPS Election Mail Coordinators to better understand USPS's services, resources, recommendations and to help resolve issues should they arise, as well as mailpiece design analysts on how to ensure quality mailpiece design for Election Mail envelopes, including ballot envelopes. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 2; Ex. 6 at 5; *see also* Glass Dec. ¶ 6.

- Identify Election Mail using USPS's official Election Mail logo, Green Tag 191 (which can be applied only to containers of mail enclosing ballots being sent out to voters), or by other means. *See, e.g.*, Ex. 1 at 2; Ex. 6 at 4, 5, 13, 23; Ex. 8 (USPS Election Mail – Graphic Guidelines and Logos (Pub. 631)); *see also* Glass Dec. ¶¶ 11-14.



Official USPS Election Mail Logo

---

[4] *See* Glass Dec. ¶ 32; *see also* Ex. 4 at 2 ("[t]he Postal Service has frequently communicated to state election officials the importance of" following best practices).



Green Tag 191

- Use tracking technology, for example USPS's Intelligent Mail Barcode, for Election Mail. *See, e.g.*, Ex. 1 at 2; Ex. 6 at 7.

- Use First-Class Mail to transmit Election Mail (including blank ballots) to voters, and allow sufficient time for delivery to and from voters. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 1; Ex. 7 at 10 (USPS Publication 632, explaining the USPS's different delivery standards and "recommend[ing] the use of First-Class Mail service to obtain timely delivery"); *see also* Glass Dec. ¶ 18.

- Keep USPS delivery standards in mind when informing voters how to vote by mail. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 1.

Lastly, the USPS has consistently urged voters to return their completed ballots early. *See, e.g.*, Ex. 1 at 2; Glass Dec. ¶ 42 ("[T]o mitigate the impacts of any surges in Election Mail sent in the days immediately before Election Day, the Postal Service is actively encouraging voters and election officials to act early"); Ex. 9 at 1 (Statement of Postmaster General Louis DeJoy Before the House Committee on Oversight and Reform (Aug. 24, 2020) "encourag[ing] all Americans who choose to vote by mail to request their ballots early and to vote early, as a common sense best practice.").

## 2. *USPS's Longstanding Special Measures for Election Mail*

For many years, USPS has taken special measures for handling Election Mail. In anticipation of the Election's increased reliance upon USPS, USPS has ramped up its efforts to ensure Election Mail is timely delivered.

First, USPS personnel have long made special efforts to physically identify and track the progress of Election Mail through USPS facilities, to ensure that Election Mail is not delayed or lost in processing or delivery. This effort is significantly aided when election officials use the official USPS Election Mail logo for all Election Mail mailpieces, affix Green Tag 191 to mail bins containing ballots being sent to voters, and check the "Election Mail" box on the postage statement form that is filled out when bulk Election Mail is entered into the USPS system. *See* Glass. Dec. ¶¶ 11-14. When a mail bin identifiable as Election Mail enters the system, USPS personnel log that container at every step of processing, so that it can be easily located if necessary. *Id.* ¶ 19. U SPS facilities also deploy end-of-day "all clears," during which in-plant personnel use a checklist to search for all Election Mail within the facility and confirm that it is in the proper location (either already sent out for delivery or further processing, or at the front of the line for the next day). *Id.*

USPS also has several longstanding practices to expeditiously process and deliver of Election Mail, particularly ballots (whether election officials have chosen to send ballots to voters using Marketing Mail or First-Class Mail). *Id.* ¶ 20. USPS devotes excess First-Class Mail processing capacity to Election Mail sent as Marketing Mail, and thereby advances it through the processing network ahead of other marketing mail. *Id.* ¶ 21. As a result, delivery timeframes for Election Mail entered as Marketing Mail are often comparable to those of Election Mail entered as First-Class Mail. *Id.* And, when identifiable, USPS prioritizes placing ballots on outgoing trucks, whether sent using First-Class Mail or Marketing Mails. *Id.* ¶ 22.

Furthermore, USPS has a longstanding practice of postmarking (also referred to as "cancelling") all completed ballots returned by mail that are readily identifiable as ballots. *Id.* ¶ 34. A postmark is a USPS imprint applied to a mailpiece, usually by an Advanced Facer

Cancellation System (AFCS) machine at a processing plant, indicating the date that the USPS accepted custody of the mailpiece, and the location the cancellation mark was applied, in order to cancel affixed postage so that it may not be reused. *Id.* ¶ 33, 35. Many mailpieces do not need to be cancelled, because they bear indicia of postage that is not at risk of being reused (*e.g.*, metered or permitted mail, or mail bearing a pre-cancelled stamp). *Id.* USPS, however, still takes measures to strive to postmark all ballots mailed by voters given the emphasis placed on postmarks by some state laws in validating the timely return of ballots. *Id.* USPS even goes so far as to cancel such ballot envelopes by hand, if necessary, to facilitate postmarking. *Id.* ¶ 34.

Based upon USPS's analysis of contemporaneous data regarding current AFCS machine capacity throughout the country, USPS has ample capacity to postmark all mailpieces readily identifiable as ballots. *Id.* USPS also plans to take extra steps for this election to identify and hand-cancel ballots that are rejected by an AFCS machine. *Id.* ¶¶ 39, 41. Further, and for the first time, USPS will use Ballot Monitors during the week preceding and through Election Day to ensure that all USPS personnel follow proper protocol for identifying and postmarking ballots. *Id.* ¶ 39.

USPS will continue these longstanding practices in support of mail-in voting for the Election. Glass Dec. ¶ 28. USPS Headquarters has not issued any direction interfering with, discouraging, or prohibiting USPS personnel from taking appropriate measures to ensure the timely delivery of Election Mail, especially ballots. Glass Dec. ¶¶ 1, 27.

### 3. *USPS's Increased Efforts in Support of the Election*

In anticipation of the additional mail volume associated with the Election, USPS remains committed to and has increased its efforts to process and deliver Election Mail. For example, Postmaster General DeJoy publicly committed that, starting on October 1, 2020, USPS will engage standby resources in all areas of its operations to satisfy any unforeseen demand related to the Election. *Id.* ¶ 29; Ex. 10 (Statement of Postmaster General Louis DeJoy (Aug. 18, 2020)) at 1-2.

These standby resources will include, among other things, availability of additional staffing, transportation, and mail processing capacity (through the use of idle windows). Glass Dec. ¶ 29. USPS has also expanded its Election Mail Task Force this year to include leaders of the postal unions and management associations, to ensure strong coordination throughout USPS and with state and local election officials, and to make sure any concerns can be raised and timely resolved at the highest levels of the organization. *Id.* ¶ 10. As discussed above, USPS has also increased the volume and frequency of its communications with election officials and will, for the first time, utilize Ballot Monitors. *Id.* ¶¶ 32, 39.

### III. USPS's Years-Long Mandate to Improve Efficiency and Control Expenses

USPS's systematic efforts to facilitate the use of U.S Mail for elections, particularly the 2020 Election, have not been diminished by USPS's mandate to improve performance, adhere to service standards, and help address USPS's precarious financial condition—a mandate that long predates Postmaster General DeJoy's tenure. Per USPS's Fiscal Year 2019 Annual Report to Congress, the USPS's financial condition results, in part, from the steady declines in First-Class and Marketing Mail volumes. *See* Ex. 1 at 28-29; *see also, e.g.*, Ex. 11 (First-Class Mail Volume Since 1926 Report, showing that the volume of First-Class Mail in 2019 was at its lowest point since 1977); Ex. 12 (Statement of Postmaster General and Chief Executive Officer Megan J. Brennan Before the House Committee on Oversight and Reform (Apr. 30, 2019)) at 1 (2019 statement of the former Postmaster noting the steep decline in First-Class Mail, the USPS's "most profitable product"). Pursuant to this mandate, USPS routinely analyzes operations and performance metrics to determine whether and where improvements can be made to further efficient service. To that end, USPS regularly reviews, among other things, collection box and equipment utilization, overtime usage, retail and facility operations, and transportation and

delivery initiatives. As a part of that process, the USPS makes determinations as to collection box and equipment removal, implementation of programs to improve efficiency, changing retail hours, consolidation or closing of facilities, and amendments to policies and practices.

In light of the increased scrutiny of these activities recently, and in an effort to bolster public confidence in USPS's ability to handle Election Mail, Postmaster General DeJoy has publicly committed to suspending the aforementioned activities, including equipment and collection box removal, changes to retail hours, plans to consolidate or close any mail processing facilities, and implementation of a limited pilot program for mail carriers. *See, e.g.*, Ex. 10. He also clarified that overtime was never banned and that it would continue to be permitted. *Id.* The only exception to Postmaster General's DeJoy's directive to maintain the status quo through Election Day pertains to the ongoing effort to improve compliance with existing schedules throughout USPS's transportation and processing networks—which, as discussed below, has not had any lasting negative impact on USPS's service performance.

## A. Periodic, Data-Based Reduction in Redundant Processing Equipment and Collection Boxes

For years, and largely the result of changing operational needs due to the decline in letter and flat mail[5] volume, USPS has periodically gathered and analyzed data relating to the utilization of blue collection boxes and mail processing machines. Based upon these analyses, USPS makes determinations regarding the reduction or reallocation of redundant collection boxes and processing equipment based upon its analyses.

USPS has over 140,000 collection boxes. *See* Declaration of Jennifer Vo ("Vo Dec.") ¶ 4. USPS regularly reviews the need for and location of collection boxes in accordance with

---

[5] "Flat mail" refers to periodicals and larger envelopes (for example, newsletters and advertising material). *See, e.g.*, DeChambeau Dec. ¶ 5.

procedures set out in the Postal Operations Manual ("POM"). *Id.* ¶ 5. Generally, a collection box is targeted for removal if it averages fewer than 25 mailpieces daily during a two week observation period. With some exceptions, USPS posts a 30-day public notice on collection boxes identified for relocation or removal before final action. *Id.* ¶¶ 5, 8. For the last seven years, USPS has removed an average of 3,100 collection boxes each year, many of which were relocated to more heavily trafficked areas. *Id.* ¶¶ 8, 10. Local USPS officials are primarily responsible for testing, assessing, and identifying collection boxes for removal. *Id.* ¶ 6. USPS has removed approximately 1,500 boxes in 2020 pursuant to this routine process, consistent with removal rates of previous years. Postmaster General DeJoy was not involved in any decisions relating to the removal of these boxes. *Id.* ¶¶ 10, 19. Rather, the removal and relocation of collection boxes (other than damaged boxes or unsecured boxes) has been suspended at least through the Election at Postmaster General DeJoy's direction. *Id.* ¶¶ 18-19.

Similarly, USPS regularly identifies mail processing and sorting equipment in approximately 289 mail processing facilities for removal and/or replacement. *See* DeChambeau Dec. ¶ 7; Declaration of Kevin Couch ("Couch Dec.") ¶ 3; Declaration of Robert Cintron ("Cintron Dec.") ¶ 5. Based on its data analyses, USPS has been steadily reducing its letter and flat mail processing equipment for several years, to align with volume reductions in those types of mail. DeChambeau Dec. ¶ 13. The number of machines reduced varies from year to year, based on utilization data. *Id.* For example, in Fiscal Year 2016, the USPS reduced 1,120 letter and flat sorting machines, while the following year it reduced only 197 machines. *Id.* In 2017, the USPS began a more structured, phased equipment reduction initiative. *Id.* ¶ 14. The first phase focused on reducing unnecessary Delivery Barcode Sorters (DCBS) and Automated Flat Sorting Machines (AFSM), which process letter and flat mail, respectively. *Id*. Later phases included reducing

unnecessary AFCS equipment. *Id.* ¶¶ 6, 16. In 2020, the USPS reduced approximately 700 letter and flat sorting machines. *Id.* ¶¶ 19-21. These reductions were planned and scheduled before Postmaster General DeJoy took office, and he had no role in their implementation, *id.* ¶ 22, Couch Dec. ¶¶ 5, 9, Declaration of Michael L. Barber ("Barber Dec.") ¶ 5. Regarding the timing of the removals, as in prior years, the removals were scheduled for summer, when mail volumes are historically lower. DeChambeau Dec. ¶ 19; Couch Dec. ¶ 4.

Mail processing machines that are taken out of service are generally removed from a facility floor and disassembled for their usable parts. Couch Dec. ¶¶ 10-11. Other machines may be offered for sale to the general public through the USPS's Corporate Asset Accountability Office. *Id.* ¶¶ 10, 12. Indeed, factoring in the mail processing machines that were removed or disconnected this year, USPS's mail processing utilization at the national level ranges from 35 percent (when mail is low) to 65 percent (when mail is high); which means that machines have ample extra capacity. Barber Dec. ¶ 6.

USPS is confident that its processing facilities have ample capacity to process all anticipated Election Mail based on its ongoing monitoring of processing capacity data, taking into account machines that have been removed from service. DeChambeau Dec. ¶ 23; Barber Dec. ¶ 6. USPS Mail Processing Operations tracks mail processing data for machines nationwide in order to evaluate whether machine utilization comports with the volume and types of mail handled in each facility, removing and/or replacing machines accordingly. DeChambeau Dec. ¶ 8; Couch Dec. ¶ 4; Barber Dec. ¶ 4. USPS may also remove machines because they are obsolete, to free up floor space for other use (*e.g.*, sorting operations or package handling equipment), or as a result of facility consolidations, though no mail processing facility closings or consolidations are scheduled

for Fiscal Year 2020 or the first quarter of Fiscal Year 2021. DeChambeau Dec. ¶¶ 7-12, 18; Couch Dec. ¶ 3; *see* Barber Dec. ¶ 11; *see also* Ex. 10 at 1 ("No mail processing facilities will be closed.").

On August 18, 2020, Postmaster General DeJoy ordered that all removals of equipment be suspended until after the Election. *See* Ex. 10 at 1; DeChambeau Dec. ¶ 22; Couch Dec. ¶¶ 13-15.

### B. *USPS's Continued Focus on Adherence to Existing Transportation Schedules*

Approximately two years ago, Robert Cintron, Vice President of Logistics at USPS Headquarters, began an initiative to improve compliance with USPS's long-established delivery schedules. Cintron Dec. ¶¶ 1, 11-13, 21. When Postmaster General DeJoy took office in June 2020, Mr. Cintron discussed the initiative with the Postmaster General and other Postal executives. *Id.* ¶¶ 22-23. Concurrent with these discussions, the OIG published a report addressing "late deliveries . . . late dispatch, extra trips, and all the time and costs" that those issues caused. Ex. 5 at 10. In that report, OIG found that "generally, the Postal Service's processing network is not operating at optimal efficiency." Ex. 13 (USPS OIG Audit Report No. 19XG013NO00O-R20, "US. Postal Service's Processing Network Optimization and Service Impacts" (June 16, 2020)) at 1. In particular, "mail processing operations were not completed on time and mail missed its last scheduled transportation trip. In response, management used overtime . . . and either delayed the scheduled transportation trip or called for an extra trip." *Id.* at 2. Among interrelated problems, "[a]bout 20 percent of total transportation trips (or four million trips) left mail processing facilities late." *Id.*

Soon after joining USPS, Postmaster General DeJoy reemphasized the need to adhere to USPS's existing operational plans, including transportation schedules. Cintron Dec. ¶ 23. Mr. Cintron and his team then developed written guidelines (generally consistent with past practices) regarding the circumstances where the scheduling of extra transportation trips is appropriate. Cintron Dec. ¶ 24 & Ex. 2. On July 14, 2020, the guidelines were distributed to area executives,

advising them of USPS's renewed effort to limit unplanned extra and under-utilized trips. *Id.* ¶ 25.[6]

During the following week, compliance with transportation schedules improved, but USPS experienced a temporary decline in its service performance. *Id.* ¶ 26. However, after USPS addressed the decline, it observed steady improvements in service performance. *Id.* ¶ 27; *See* Declaration of Angela Curtis ("Curtis Dec.") ¶ 30. On August 31, 2020, Postmaster General DeJoy provided updated information to Congress showing "the expected improvements in service. . . . across all major mail categories in the weeks prior to my testimony, and this trend has continued through August, rapidly returning to early July levels. . . . while still adhering to our existing transportation schedules. In other words, we are improving service performance while more consistently running our trucks on time." *See* Service Performance Rebounds at Postal Service (Aug. 31, 2020) at 1, https://about.usps.com/newsroom/national-releases/2020/0831-service-performance-rebounds-at-postal-service.htm; *id.* Congressional Briefing (Aug. 31, 220) at 8 (data showing that USPS service performance has rebounded to early-July 2020 levels), https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf

---

[6] USPS is aware of a memorandum dated July 10, 2020, titled "Mandatory Stand-Up Talk: All Employees," which discusses some issues relating to late and extra trips. *See* Cintron Dec. ¶ 24 n.1. USPS, upon investigation, learned that this memo was locally prepared; it was not created, reviewed, or approved by USPS Headquarters. *Id.* The memo does not represent official USPS policy, in fact, it mischaracterizes USPS policy and the USPS's initiative to encourage compliance with transportation schedules. *Id.* As discussed in the Supplemental Declaration of Robert Cintron ("Supp. Cintron Dec"), the July 10 memorandum drew from a teleconference discussion conducted between regional and Headquarters officials, but "[s]tarting on July 11, 2020, in light of some confusion in the field about the scope of USPS policy, members of Headquarters begin to issue clarifications of USPS policy, including with [Area Vice Presidents] making clear that certain statements in the July 10, 2020 [memorandum] were not accurate statements of USPS policy." *Id.* ¶¶ 3-4. This include clarifying the circumstances where extra trips were permissible. *Id.* ¶ 4. "Late and extra trips are not and were not banned, rather they continued (albeit at a reduced level) both in July and today." *Id.*

("Congressional Briefing"); Cintron Dec. ¶ 27. Furthermore, in the last two months, there has been a sharp decrease in late and extra trips. *See* Congressional Briefing at 4-6 (data showing a steep decline since early July in late and extra trips); Cintron Dec. ¶ 27. USPS's performance continues to improve. *See* USPS Service Performance Continues Upward Trend (Sept. 10, 2020), https://about.usps.com/newsroom/national-releases/2020/0910-usps-service-performance-continues-upward-trend.htm.

### C.    *USPS Personnel Practices Related to Overtime Usage and Staffing Shortages Caused by the Covid-19 Pandemic*

#### 1.    *Overtime*

Defendants have not attempted to curtail USPS's ability to handle Election Mail by banning or unreasonably restricting employee overtime. USPS's customary overtime practices, pursuant to which overtime is generally evaluated and approved by local field managers (not Headquarters personnel), have remained unchanged since Postmaster General DeJoy took office, and the rate at which USPS has incurred overtime has remained constant. *See* Curtis Dec. ¶¶ 12, 22-23; Declaration of Joshua Colin, Ph.D. ("Colin Dec.") ¶¶ 3-4. To the extent USPS has made past efforts to monitor or address certain issues regarding overtime usage, such efforts are unrelated to the Election. Instead, these efforts consist of ongoing, routine measures to improve efficiency and reduce unnecessary costs. *See* Curtis Dec. ¶¶ 12-13; Colin Dec. ¶¶ 3-6.

In maintaining the status quo leading up to the Election, Postmaster General DeJoy clarified that he never banned overtime, and continues to approve of its appropriate use. *See, e.g.*, Ex. 14 14 (Transcript of House Oversight and Reform Committee on Postal Service Operational Changes Hearing (Aug. 24, 2020)) 14 ("I did not direct the elimination or any cutback in overtime."); Ex. 10 at 1 ("[W]e reassert that overtime has, and will continue to be, approved as needed").

## 2. The Impact of the COVID-19 Pandemic

Since March 2020, USPS has faced significant staffing issues caused by the COVID-19 pandemic. *See* Declaration of John Prokity ("Prokity Dec.") ¶ 4; Curtis Dec. ¶ 18. Prior to the pandemic, USPS experienced, on average, a weekly equivalent of 55,000 employees using full-day leave. Prokity Dec. ¶ 5. In early March, this figure began to increase until it peaked in mid-April at 81,000, or the equivalent of nearly 26,000 additional employees using full-day leave in a week. *Id.* Thereafter, the situation improved somewhat until July, when personnel availability again began to decrease (hitting its lowest levels in the week of July 11, 2020). *Id.*

To mitigate these staffing shortages, which negatively impacted USPS's ability to timely deliver mail, *see id.* ¶¶ 20-21, Prokity Dec. ¶¶ 6, 10, USPS has taken extraordinary steps to hire additional employees.[7] *See* Prokity Dec. ¶ 6. For instance, USPS has implemented a number of changes to its normal hiring processes to be able to hire employees more quickly, and has negotiated agreements with the postal workers' unions to allow the hiring of non-career employees above the historical contractual limits. *See id.* ¶¶ 7-8. As a result of these and other efforts, USPS has hired an average of 2,000 to 3,000 employees per week, with a total of 88,627 new employees hired between March 1 and August 27, 2020. *Id.* ¶ 9.

## D. Other Efforts Aimed at Improving Efficiency

There are two other practices that have prompted election-related criticism of USPS: setting "park points" (*i.e.*, locations where a driver parks and exits a postal vehicle to deliver mail on foot) and "Expedited to Street/Afternoon Sortation" ("ESAS"), a limited pilot program aimed at reducing morning activities to allow carriers to begin their routes earlier. There is no nationwide

---

[7] On August 7, 2020, in connection with a high-level organizational restructuring, USPS implemented a hiring freeze for managerial positions. Prokity Dec. ¶ 6 n.1. This action has had no effect on the hiring of non-management employees, including mail carriers, mail handlers, and clerks. *Id.*; *see also* Curtis Dec. ¶ 25.

USPS policy setting a fixed cap on the number of park points that may be used on a route, nor has Postmaster General DeJoy made any changes to USPS practices regarding park points. Colin Dec. ¶¶ 12-14. Furthermore, the ESAS was planned before Postmaster General DeJoy took office, and it was suspended at the Postmaster General's direction. Colin Dec. ¶ 11.

## IV.    Procedural History

Plaintiffs filed this Complaint on August 28, 2020, Compl, ECF No.1, and their Motion for Preliminary Injunction, ECF No. 16, on September 8, 2020. Plaintiffs challenge USPS's purported "Late/Extra Trip Policy," which purportedly forbid all extra and late mail trips. *See* PI Mem. at 5.

Twelve lawsuits, including this one, have been filed recently across the country concerning purported changes made by USPS since Postmaster General DeJoy took office. Generally, the plaintiffs in these cases allege that the purported changes were intended to obstruct voting by mail for the Election, asserting overlapping constitutional and statutory claims. Despite the fact that the USPS suspended almost all of the complained-of activities it had actually been undertaking (almost of which were long-standing practices of USPS) until after the Election, these plaintiffs continue to pursue litigation.[8]

## STANDARD OF REVIEW

"The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted). An interim injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden

---

[8] Because the issues here are largely the same, and in the interest of efficiency, Defendants also rely here on the declarations filed in support of Defendants' preliminary injunction briefing in *Jones, et al. v. United States Postal Service, et al.*, No. 1:20-cv-06516 (S.D.N.Y.).

of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). A party moving for a preliminary injunction "must demonstrate '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *Jack's Canoes*, 933 F. Supp. 2d at 75-76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). When, as here, the government is opposing a motion for a preliminary injunction, the third and fourth factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).[9]

Moreover, Plaintiffs seek to revoke certain USPS policies that have purportedly gone into effect, rather than to prevent their implementation. Where "a party seeks a mandatory injunction, i.e., to change the status quo rather than to preserve it, the moving party 'must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction.'" *Ajilon Prof. Staffing, PLC v. Kubicki*, 503 F. Supp. 2d 358, (quoting *Columbia Hospital for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997)).

## ARGUMENT

---

[9] "The D.C. Circuit has, in the past, followed the 'sliding scale' approach to evaluating preliminary injunctions . . . . The continued viability of the sliding scale approach is highly questionable, however, in light of the Supreme Court's holding in *Winter v. National Resources Defense Council*, 555 U.S. 7, 22 (2008)." *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013), for the proposition that all four prongs of the preliminary injunction standard must be met before injunctive relief can be granted). In any event, regardless of which standard is applied, preliminary injunctive relief is inappropriate here.

# I.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

## A.   Plaintiffs Lacks Article III Standing

At the outset, Plaintiffs cannot succeed on their claims because they cannot show that they have Article III standing. To establish standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). When a plaintiff seeks prospective relief, the "threatened injury must be *certainly impending* to constitute injury in fact;" "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Neither the Organization Plaintiffs,[10] nor the Individual Plaintiffs,[11] can meet this standard.

### 1.   The Organization Plaintiffs cannot establish standing to sue in their own right.

Generally, for organizational standing, the challenged conduct must "perceptibly impair[]" the "organization's *activities*," with a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (emphasis added). "An organization must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)). Thus, the Organization Plaintiffs must show that the alleged USPS policies "perceptibly impaired [their] ability to provide services," causing an "inhibition of [their] daily operations." *Id.*

---

[10] Vote Forward, Voces Unidas de las Montañas, Colorado Organization for Latina Opportunity and Reproductive Rights ("COLOR"), and Padres & Jóvenes Unidos.

[11] Amy Bolan, Aaron Carrel, Dante Flores-deMarchi, Paul Hunter, Sebastian Immonen, Kathryn Montgomery, Sean Morrison, Inderbir Singh Datta, Martha Thompson, Linda Roberson.

Here, there is no allegation—much less evidence—indicating that any alleged USPS policy change has directly "impaired [the] ability" of or "inhibited" the Organization Plaintiffs from carrying on with their pre-existing activities. These Plaintiffs argue only that they chose to expend resources towards other programs, such as educational programs, in response to the alleged USPS policy changes. This type of voluntary expenditure is insufficient for standing. *See Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017) ("any resources [plaintiff] used to counteract" the challenged conduct is "a self-inflicted budgetary choice that cannot qualify as an injury in fact.") (quoting *Am. Soc'y of Prevention of Cruelty to Animals v. Feld Ent. Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011)), *cert denied*, 139 S. Ct. 791 (2019).

But even if voluntary expenditures were sufficient, the D.C. Circuit has made clear that "an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Food & Water Watch*, 808 F.3d. at 920 (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434); *see also Ctr. for Responsible Sci. v. Hahn*, 809 F. App'x 10, 12 (D.C. Cir. 2020) (rejecting Article III injury-in-fact where organization's "stated mission is *educating the public* on specific issues—here, issues related to scientific research practices and the informed consent of clinical trial participants—and challenging governmental regulations that do not advance its goals" (emphasis added)). All of the Organization Plaintiffs are social interest organizations who educate and assist potential voters as part of their standard activities. *See*, *e.g.*, Compl. ¶ 12 ("Vote Forward is a . . . nonprofit organization" that "help[s] register voters"); *id.* ¶ 14 ("Plaintiff Voces Unidas de las Montañas . . . is a non-profit organization that seeks to" assist

persons "through civic engagement."). Thus, the Organization Plaintiffs have failed to establish a cognizable injury.

But even if the Organization Plaintiffs can establish an injury, they cannot establish third-party standing to bring the only claim on which they base their motion: that the alleged USPS policy changes burden citizens' right to vote. Third party standing "constitutes a limited exception[] to the general rule that a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 23 (D.D.C. 2010) (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)). To establish third-party standing, an entity must not only show that it has suffered an injury, but also (i) that it has "a close relation to the third party," and (ii) there is "some hindrance to the third party's ability to protect his or her own interests." *Id.* (quoting *Powers*, 499 U.S. at 411). Here, the Organization Plaintiffs provide no explanation for why voters are unable "to protect [their] own interests."[12] Accordingly, the Organization Plaintiffs generally do not have standing to challenge the alleged USPS policy changes, nor do they specifically have standing to bring their Constitutional claim.[13]

---

[12] Although Defendants contend that the Individual Plaintiffs here have failed to establish a non-speculative injury sufficient for standing, and thus cannot bring a Constitutional challenge to the alleged USPS policies, that does not mean other voters would similarly fail to establish standing.

[13] Plaintiffs cannot establish associational standing because they cannot satisfy the requirement that their "members would otherwise have standing to sue in their own right." *W. Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 69 (D.D.C. 2013). To satisfy this requirement, it is "clearly established" that Plaintiffs must *specifically identify* the members who would have standing. *See id.* at 70 Here, the only specifically identified persons are the individual plaintiffs, and they lack standing for the reasons stated herein.

**2.** *The Individual Plaintiffs cannot establish a cognizable injury since they rely only on a speculative allegation that purported USPS policy changes will affect their ability to vote by mail.*

To establish an injury, the Individual Plaintiffs rely on the theory that potential delays caused by the USPS policy changes at issue will specifically impact their ability to vote by mail. In particular, Plaintiffs claim that delays may affect those who vote at or near the deadline since their ballots may not be delivered in time to be counted. *See*, *e.g.*, Compl. ¶¶ 88-93. But with respect to Individual Plaintiffs in particular, this "theory of standing . . . relies on a highly attenuated chain of possibilities" and thus "does not satisfy" the injury requirement for standing. *Clapper*, 568 U.S. at 410. First, there is no indication that the Individual Plaintiffs will delay in requesting their ballots or in returning them to their election officials, such that a delay may implicate their ability to have their vote be counted. Although these Plaintiffs vaguely suggest that they may submit their ballots "close to Election Day," or "perhaps on the weekend before Election Day," Pls.' Mot for Prelim Inj., at 31-34, ECF No. 16 ("PI Mot."), this is not the type of concrete allegation necessary to establish an injury that is "certainly impending," *Clapper*, 568 U.S. at 409.

Moreover, Plaintiffs cannot establish that such delay would be necessary. Although Plaintiffs claim that they want additional time to vet candidates, it is unclear why they cannot still perform this task while still returning their ballots a few days earlier than anticipated (to ensure timely delivery). Additionally, they can request their ballot as early as possible, and can drop their ballots off at a drop-box to ensure they are counted. Any allegation that they would delay, despite their speculative fears about the potential consequences, would be a self-inflicted injury that fails to establish standing. *See Clapper*, 568 U.S. at 416 (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves").

Second, even if they mail in their ballots at or near the deadline, there is no indication that the delivery of *their* ballots in particular will be delayed. Although Plaintiffs assert that the alleged

USPS policies will create delays, *see*, *e.g.*, Compl. ¶ 109, they do not contend that these delays will affect all (or even most) Election Mail. Accordingly, the Individual Plaintiffs' injury theory relies upon a "speculative chain of possibilities" (i.e. that they will request their ballot late, return it late, face a mail delay caused by the policies at issue in this case, and have their ballot rejected due to the delay) that is insufficient for standing. *Clapper*, 568 U.S. at 414.

> **B.    Plaintiffs are unlikely to succeed on the merits of their *Anderson-Burdick* right-to-vote claim.**

Plaintiffs argue that the alleged USPS policy changes may cause delays, and thus if persons choose to mail in their ballots at or near the deadline, the ballots may not be processed and delivered in time to be counted. Plaintiffs thus claim that the USPS policy changes unconstitutionally burden the right to vote, not because these changes categorically prevent persons from voting (or even from voting by mail), but because they require persons to promptly submit their ballots. Plaintiffs' claim is without merit.

As an initial matter, Plaintiffs' legal theory is inconsistent with established case law confirming that there is no constitutional right to vote by mail, and that States may decline to offer mail-in voting altogether.[14] If a State can prohibit mail-in voting—even if, as Plaintiffs contend, certain persons can *only* vote by mail, *see* PI Mot. at 25—then USPS policies which may indirectly limit *when* a ballot must be mailed cannot be constitutionally suspect. In any event, Plaintiffs'

---

[14] *See*, *e.g.*, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J. concurring) ("That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required."); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 n.6 (1969) (The Supreme Court has rejected "a claimed right to an absentee ballot."); *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (Posner, J.) (There is no "blanket right of registered voters to vote by absentee ballot."); *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020) ("[T]here is no constitutional right to an absentee ballot."); *Texas Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) ("The Virus's emergence has not suddenly obligated Texas to do what the Constitution has never been interpreted to command, which is to give everyone the right to vote by mail.").

claim fails for a variety of other reasons. First, contrary to Plaintiffs' assertion, the *Anderson-Burdick* balancing test does not apply to the purported USPS policy changes at issue. Instead, the USPS policy changes are at most subject to the rational basis test, which they undoubtedly survive. Second, regardless, the USPS policy changes would survive the *Anderson-Burdick* balancing test.

      1.   ***Anderson-Burdick* does not apply to the alleged USPS policy changes at issue.**

      i.   **Anderson-Burdick applies only to election laws.**

Plaintiffs assert their claim is governed by the *Anderson-Burdick* test. This test arises from a body of precedent concerning the constitutionality of state election laws. Although the legal bases for an *Anderson-Burdick* claim are the First and Fourteenth Amendments, the test eschews the standard analyses applicable to claims under these provisions. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Instead, the *Anderson-Burdick* test generally requires the Court to "weigh the character and magnitude of the burden [a] State's rule imposes on those rights against the interests the State contends justify that burden." *Id.*

Multiple cases, including *Anderson* and *Burdick*, confirm that this test applies only to election laws; *e.g.*, laws which "govern[] the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). *Anderson* expressly indicated that its balancing test applies to "Constitutional challenges to specific provisions of *a State's election laws*." *Id.* at 789 (emphasis added). Likewise, *Burdick v. Takushi* confirmed that the test set forth in *Anderson* applies when "[a] court [is] considering a challenge to *a state election law*." 504 U.S. 428, 434 (1992) (emphasis added); *see also id.* (quoting *Anderson* balancing test, and noting that "[u]nder this standard," the Court "inquir[es] into the propriety of *a state election law*." (emphasis added)). The Supreme Court has repeatedly indicated that this test applies to actual election laws. *See Twin Cities Area New Party*,

520 U.S. at 358 (stating that the *Anderson-Burdick* framework is used "[w]hen deciding whether *a state election law* violates First and Fourteenth Amendment associational rights." (emphasis added)); *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 451–52 (2008) (citing *Anderson* and *Burdick*, and noting that it applies to "*Election regulations*" which impose "restrictions on election procedures." (emphasis added)). Plaintiffs cite to no case in which this test has been applied to a non-election law that may have an attenuated, indirect effect on the electoral process.

The Supreme Court's willingness to avoid a standard First and Fourteenth Amendment analysis, and adopt a unique balancing test in the election law context, makes sense given the unique qualities of election laws. For example, election laws directly restrict electoral activity, and so courts may assume that "First and Fourteenth Amendment rights [will be] implicated by [those] restrictions." *Anderson*, 460 U.S. at 786 n.7. Further, since "[e]lection laws . . . invariably impose some burden upon individual voters," courts need not inquire into intent; they can assume that election laws intend to place restrictions on voters. *Burdick*, 504 U.S. 428 at 433. The same considerations do not apply to non-election laws, or, indeed, the everyday actions of the agencies of the Federal government.

Applying the *Anderson-Burdick* balancing test to *any* policy that has some impact on the electoral process would produce odd results. For one, it would be mean that any deficiency in USPS service could give rise to a constitutional voting rights claim. Additionally, many policies may have an indirect impact on elections. A federal policy that limits transit subsidies may impede persons' ability to travel to the polls; a zoning restriction may inhibit certain persons' ability to live closer to a polling station; inadequate government health care policy may ultimately preclude someone from voting either in-person *or* by mail. The impact of these policies on voting rights

would likely be inadvertent, and yet these policies could be struck down if a court finds that their impact on voting rights "outweighs" any government interests they serve. This is less of a concern in a standard *Anderson-Burdick* case, since the State is typically aware of the electoral impact of its election law, and thus there are "precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick*, 504 U.S. at 434. Unsurprisingly, Defendants could not locate a single case applying this test to a policy akin to the USPS policy changes at issue.

If the *Anderson-Burdick* test does not apply, Plaintiffs' right-to-vote claim necessarily fails. Although USPS is still subject to the First and Fourteenth Amendments, Plaintiffs have made no attempt to establish a standalone claim under either provision. They have tried only to establish a claim under the *Anderson-Burdick* framework. And this distinction is not just a formality. There are meaningful differences between *Anderson-Burdick* and the standard requirements for First and Fourteenth Amendment claims. *See*, *e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 n.9 (11th Cir. 2019) ("Under *Anderson-Burdick*, it is not necessary for a plaintiff to show discriminatory intent to make out a claim that the state has unconstitutionally burdened the right to vote. To be sure, a traditional Equal Protection Clause claim is cognizable in the voting context if the plaintiff alleges that discriminatory animus motivated the legislature to enact a voting law."), *denying mot. to vacate*, 950 F.3d 790 (11th Cir. 2020). Accordingly, since the *Anderson-Burdick* framework does not apply here, Plaintiffs' claim fails.

> **ii. Even if the Court finds that the alleged USPS policy changes are subject to Supreme Court election law jurisprudence, *McDonald* would apply here, not *Anderson-Burdick*, and so the alleged USPS policy changes would be subject to the rational basis test.**

Even if the Court concludes that the alleged USPS policy changes may constitute "election laws," they are subject to the rational basis test under *McDonald v. Board of Election Com'rs of Chicago*, 394 U.S. 802 (1969). There, plaintiffs—county jail inmates—"[could not] obtain

absentee ballots" from their local Board of Elections and "[could not] readily appear at the polls." *Id.* at 803. They brought suit, asserting that the Board's position was subject to strict scrutiny and imposed an unconstitutional burden on their right to vote. *See id.* at 806-07. The Supreme Court disagreed, holding that "[s]uch an exacting approach is not necessary" since it is "not the right to vote that [was] at stake here but a claimed right to receive absentee ballots." *Id.* at 807. It noted that a more rigid standard is proper only when the policy or practice at issue categorically "den[ies] [plaintiffs] the exercise of the franchise . . . preclud[ing] [them] from voting." *Id.* at 807-08. Otherwise, the policy or practice "must bear" only "some rational relationship to a legitimate state end" and "will be set aside only if no grounds can be conceived to justify them." *Id.* at 809.

The Court's decision in *McDonald* controls here because Plaintiffs are claiming that USPS policies may deprive them of the ability to cast votes through mail-in ballots. And although Plaintiffs allege that mail-in ballots are necessary since external circumstances make in-person voting challenging, their position is not materially different from the county jail inmates in *McDonald* who were physically restricted from the polls. Thus, the alleged USPS policy changes would be subject to the rational basis test, which they easily satisfy since policies aimed at making USPS more cost-effective and efficient certainly bear "some rational relationship to a legitimate state end."

## 2. *Even if Anderson-Burdick applies, the alleged USPS policy changes are still constitutional.*

When applying the *Anderson-Burdick* balancing framework, the Court must "first consider the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. The "rigorousness of [the Court's] inquiry into the propriety of a state election law"— assuming, *arguendo*, that USPS policy changes may somehow constitute "election laws"—"depends upon the extent to which the challenged regulation burdens First and

Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. Defendant need only establish a compelling government interest if plaintiffs' "rights are subjected to 'severe' restrictions," *id.*, such as those that effectively "disenfranchise [a] class" of persons, *Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973). Otherwise, for minimal, "nondiscriminatory restrictions," the defendant must establish only an "important regulatory interest." *Burdick*, 504 U.S. at 434.

Here, the alleged USPS policy changes at issue have not, and will not, impose a "severe" burden on voters. First, as explain in *supra*, USPS has not instituted a ban on late trips or extra trips. Postmaster General DeJoy did call for a renewed focus on compliance with long-standing pre-set schedules, *see supra* ,but this hardly imposes a "severe" burden on the right to vote. For one, there is little indication that this will alone will cause material delays, especially in light of the resources USPS is committing to Election Mail, and USPS's assurance that it has the capacity to process the expected volume of Election Mail. *See supra*. But even if this renewed focus on schedules may cause delays, that alone is not a severe burden on voting. Both States and voters can ensure, with minimal burden, that these delays will not impact the voting process. USPS is encouraging States to take certain measures to ensure that mail-in ballots are promptly distributed. *See supra*. Additionally, voters can promptly mail in their ballots. If they wait until the eleventh hour to cast their ballots, and their votes are not counted due to some delay, then "if their plight can be characterized as disenfranchisement at all, it was not caused by" USPS but rather "their own failure to take [the] timely steps" necessary. *Rosario*, 410 U.S. at 758. Although USPS takes its obligations seriously and treats Election Mail with special focus as a result, it cannot be required by the Constitution to ensure that a voter's ballot arrive in the timeframe set by her state if that voter mails the ballot the day before the state's deadline. In such instances, the voter has an alternative choice to ensure that her vote is counted—voting in person at a polling place established

by the State or even delivering the ballot to an election drop box in certain states. *See, e.g.*, D.C. Code Ann. §§ 1-1001.05(9) (polling places, including no fewer than 80 polling places for the November 3, 2020 General Election); 1-1001.09(b-1) (early voting centers)

The alleged USPS policy changes may therefore survive an *Anderson-Burdick* inquiry if justified by "general regulatory interests," which includes a desire to minimize "administrative costs." *Libertarian Party v. D.C. Bd.of Elections & Ethics*, 682 F.3d 72, 77 (D.C. Cir. 2012). Here, the renewed focus on compliance with pre-set schedules is intended to increase efficiency, and minimize unnecessary costs, precisely the type of "general regulatory interest" sufficient to justify a minimal, indirect burden on voters.

Plaintiffs' arguments in response largely quibble with the soundness of USPS's policy decisions. For example, Plaintiffs argue that the USPS policy changes ultimately proved inefficient, at least in the short term. *See* PI Mot. at 26-27. But Plaintiffs cite to no case law indicating that USPS not only has to pursue a legitimate regulatory interest, but also prove that its policy was immediately successful in promoting that interest. *Cf. Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 460-66 (1981) (when conducting rational basis review, the court does not "weigh and evaluate this evidence" and determine "[w]hether in fact the" policy at issue "will promote" its desired end "is not the question"). USPS took the action at issue based on its assessment that this would produce certain legitimate benefits. *See supra*. And although there were delays initially—some of which may be attributed to the COVID-19 pandemic—recent data shows a decline in delays. *See supra*. Plaintiffs also argue that any savings produced by USPS's insistence on observing the pre-set schedules would be minimal, that USPS is financially stable, and that Postmaster General DeJoy indicated that no further funding is necessary for USPS to adequately process and deliver election mail. *See* PI Mot. at 27-29. But again, these points do not dispute that

USPS took the action at issue, in part, for the purpose of minimizing cost, an interest that becomes no less legitimate simply because Plaintiffs find it unnecessary. *Cf. F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993) (rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of" government policy; "[w]here there are 'plausible reasons'" for the policy, the court's "inquiry is at an end.") (quoting *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)). Accordingly, the proffered justifications for the USPS policy at issue are sufficient to justify the indirect, minimal burden it may impose on voters. Plaintiffs are unlikely to prevail on their *Anderson-Burdick* claim.

## II. PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM.

In order to justify injunctive relief, "the injury must be both certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v. F.E.R.C.*, 758 F.2d at 669, 674 (D.C. Cir. 1985); *see also Power Mobility Coalition v. Leavett*, 404 F. Supp. 2d 190, 203 (D.D.C. 2005) (plaintiff must show that injury is "imminent, certain and irreparable"). Plaintiffs' claimed injuries do not suffice.

The Individual Plaintiffs' admissions that they prefer to wait to send in their ballots "close to Election Day," PI Mot. at 31-34, including up to "the weekend before the election," because they want to avoid "risk[ing] casting a vote [they] may later regret," *id*. at 32, or because they want to wait . . . until [they have] all the information [they] need[] to make decisions on how to vote," *id.* at 34, are simply insufficient and too speculative to establish an injury, let alone an irreparable one. If they wait until the eleventh hour to cast their ballots, and their votes are not counted due to some delay, then "if their plight can be characterized as disenfranchisement at all, it was not caused by" USPS but rather "their own failure to take [the] timely steps" necessary. *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973). In any event, in light of the service improvements and ongoing efforts to timely delivery Election Mail described *supra*, the Individual Plaintiffs have failed to show that,

if they mailed their ballots a reasonable time before the election (which is approximately two months away), the ballots would not be received in time to be counted.

Second, the Organizational Plaintiffs' claimed injury to their resources falls well short of establishing a "certain and great" harm. *Wisc. Gas Co.*, 758 F.2d at 674. "An organization, to show irreparable harm, must show first that "the 'actions taken by the defendant have perceptibly impaired the organization's programs . . . If so, the organization must then also show that the defendant's actions 'directly conflict with the organization's mission.'" *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 177 (D.D.C. 2017) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016)). The organizational Plaintiffs claim that they have had "to redirect their limited resources, which includes both their labor and their funds, to address challenges caused by Defendants' Policy that were unforeseen." PI Mot. at 35. But Plaintiffs have not established that mail delays were solely a result of the challenged "Late/Extra Trip Policy." Indeed, the transportation initiative happened at the same time as the COVID-19 pandemic. "The COVID-19 pandemic led to significant staffing shortages beginning in March 2020." Prokity Dec. ¶ 4. And though the staffing shortage indicators recovered somewhat in June, "the availability for July again began to decrease, with availability falling to its lowest levels in the week of July 11, 2020." Id. ¶ 5. This is the same time that the delays of which Plaintiffs complains began. Indeed, while "localized staffing shortages resulted in additional service disruptions in July," [s]taffing availability in some of those localities has steadily improved as additional employees have been hired, and others have returned to work following illness or quarantine." *Id*. ¶ 10. That is the same time that USPS's performance numbers have improved. Given the simultaneous impact of this generational pandemic, Plaintiffs cannot show that the "Late/Extra Trip Policy" they challenge

here was the sole cause of their injury, as opposed to COVID-19; much less that it will be moving forward.

Moreover, assuming that the prior mail delays caused Plaintiffs to divert resources, Plaintiffs cannot establish that any future harm is imminent or likely to recur. As set forth *supra*, USPS has taken a number of steps that have resulted in service performance improving. And while Plaintiffs have gestured toward certain operational costs they are incurring whether because of launching certain programs (including one "controlled experiment in Florida," PI Mot. at 36), or "initiat[ing] outreach and canvassing efforts earlier than anticipated," *id.* at 37, they have not seriously attempted to show that such changes are "great," as this Circuit requires. *Cf. Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. CV 20-1630 (JEB), 2020 WL 5232076, at *38 (D.D.C. Sept. 2, 2020) (finding irreparable harm where an organization demonstrated it will likely experience an array of financial and operational burdens as a result of the two regulatory actions) (citing cases). Given the speculative nature of any future injury, Plaintiffs have not shown that injury is "certain and great," and thus cannot show that it would be irreparable.

### III.    THE BALANCE OF THE EQUITIES DOES NOT JUSTIFY RELIEF.

A preliminary injunction is also not appropriate because the balance of the equities and public interest weigh in Defendants' favor. As explained *supra*, USPS is currently undertaking extensive efforts to facilitate the timely delivery of Election Mail. There is no dispute that USPS has the capacity, including in terms of financing and machinery, to handle the anticipated surge in Election Mail. And the Individual Plaintiffs have an opportunity to avoid any harm by mailing in their ballots without delay. The equities therefore weigh against an injunction here.

Moreover, an order enjoining Defendants "from implementing the Late/Extra Trip Policy announced in the July 10, 2020 document entitled 'Mandatory Stand-Up Talk: All Employees,'"

Text of Proposed Order, at 1, ECF No. 16-26, in this context would be particularly inappropriate. As explained *supra*, that document does not represent official USPS policy, in fact, it mischaracterizes USPS policy and the USPS's initiative to encourage compliance with transportation schedules. *See also* Supp. Cintron Dec. ¶ 4. Moreover, full compliance could require the Court to act as an overseer of the agency's day-to-day activities (including whether extra trips carrying mail are permitted); something that is inappropriate even in APA cases, and for good reason. *See, e.g., Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) (noting the importance of "protect[ing] agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.").

## **CONCLUSION**

For the aforementioned reasons, this Court should deny Plaintiffs' motion for a preliminary injunction.


Dated:  September 15, 2020          Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC R. WOMACK
Assistant Director, Federal Programs Branch

*/s/ Kuntal Cholera*
JOSEPH E. BORSON (Va. Bar No. 85519)
KUNTAL CHOLERA
ALEXIS ECHOLS
DENA M. ROTH
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 514-1944
Joseph.Borson@usdoj.gov

*Attorneys for Defendants*